## ALEXANDER *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 1309. Argued and submitted January 16, 1891. — Decided February 2, 1891.

It is the duty of counsel, in a criminal case, to seasonably call the attention of the court to any error in impanelling the jury, in admitting testimony, or in any other proceeding during the trial by which the rights of the accused may be prejudiced, and, in case of an adverse ruling, to note an exception; and if counsel fails in this respect, error cannot be assigned for such causes.

It being shown in a trial on an indictment for murder, that on the day of the disappearance of S. (the murdered man), and of Mrs. H., her husband and his relatives were seen, armed with guns and pistols, hunting for S. and Mrs. H., who were supposed to have eloped together, the declarations at that time of H. as to his purpose in doing so were part of the *res gestæ :* but this court does not decide whether it was error to rule them out.

Statements regarding the commission of a crime already committed, made by the party committing it to an attorney at law when consulting him in that capacity, are privileged communications, whether a fee has or has not been paid, and whether litigation is pending or not.

The rule announced in *Queen v. Cox,* 14 Q. B. D. 153, should be limited to cases where the party is tried for the crime in furtherance of which the communication is made.

THE case is stated in the opinion.

*Mr. A. H. Garland* and *Mr. H. J. May,* for appellant, submitted on their brief.

*Mr. Solicitor General* for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

This was a writ of error sued out under the sixth section of the act of February 6, 1889, 25 Stat. 655, 656, c. 113, § 6, to review a judgment of the Circuit Court of the United States for the Western District of Arkansas, imposing a sentence of death upon the plaintiff in error for the murder of David C. Steadman " at the Creek Nation in the Indian country."

The plaintiff in error relied upon the following grounds for reversal:

1. That the court erred in its selection of the jury, in that the defendant was required to make his challenges without first knowing what challenges the government's attorney had made, and thus challenged two jurors, to wit, C. F. Needles and Samuel Lawrence, who were also challenged by the government, whereby he was deprived of two of his challenges contrary to law.

2. That the court erred in excluding the testimony offered by the defendant to prove threats to kill Steadman made by House and others, while they were hunting Steadman under the belief that he had seduced the wife of the said House, and was secreting himself with her in the neighborhood.

3. Because the court erred in admitting the testimony of J. G. Ralls as to confidential communications made to him as the attorney of the defendant.

(1) With regard to the first error assigned, it appears from the record that " the court directed two lists of thirty-seven qualified jurymen to be made out by the clerk, and one given to the district attorney and one to the counsel for the defendant; and the court further directed each side to proceed with its challenges independent of the other, and without knowledge on the part of either as to what challenges had been made by the other. To which method of proceeding in that regard defendant at the time offered no objections, but proceeded to make his challenges, and in so doing challenged two jurors, to wit, C. F. Needles and Samuel Lawrence, who had been also challenged by the government." We do not deem it necessary to inquire whether there was error in the method pursued by the court in impanelling this jury. It appears distinctly from the bill of exceptions that the defendant offered no objection to it at the time, and made no demand to challenge any of the jury beyond the twenty allowed by Revised Statutes, section 819. Indeed, it does not clearly appear which side made the first challenges, or that defendant had not exhausted his challenges before the government challenged the two jurors in question. If it were a fact that the defend-

ant had made his twenty challenges before the government challenged these two men, it is difficult to see how his rights were prejudiced by the action of the district attorney.

But the decisive answer to this assignment is, that the attention of the court does not seem to have been called to it until after the conviction, when the defendant made it a ground of his motion for a new trial. It is the duty of counsel seasonably to call the attention of the court to any error in impanelling the jury, in admitting testimony, or in any other proceeding during the trial by which his rights are prejudiced, and in case of an adverse ruling to note an exception. *Stoddard* v. *Chambers*, 2 How. 284; *De Sobry* v. *Nicholson*, 3 Wall. 420; *Canal Street Railroad* v. *Hart*, 114 U. S. 654; Thompson on Trials, §§ 690, 693, 700.

(2) To understand fully the force of the second error assigned, it is necessary to state so much of the evidence as exhibits substantially the case made out by the government. The evidence tended to show that the defendant and the deceased, Steadman, had agreed to go into the stock business together, and, upon the day of the murder, were endeavoring to rent a farm for the purpose of wintering their horses, and making a crop the following year. They were returning to their camp both armed with guns. Defendant was also armed with a pistol. So far as the evidence discloses, Steadman disappeared and was never seen alive again. A few minutes after they were last seen, a witness, who had met them, saw the two horses, without riders, standing in the road near a wood. Shortly after, eight or nine shots were heard in the wood, and after this the defendant was seen upon the road, sitting upon one of the horses, and leading the other, which had no rider. In about twelve days the body of Steadman was found half a mile from the place from which he and defendant had been seen, and within seventy-five yards of the place where the horses were seen standing. His skull was crushed, and there was a bullet hole in it back of the ear. There was also evidence that Steadman had a large amount of money on his person at the time he disappeared. The defendant offered contradictory explanations of Steadman's disappearance — at

one time said he had probably been killed, and at another time suggested suicide, and, at another, pretended to believe a story that had been circulated in the neighborhood that Steadman and a married woman by the name of House had disappeared and were hiding together. Evidence was admitted tending to show that Mrs. House and Steadman had been seen in conference the day before, and that the general impression in the neighborhood at the time was that they had gone off together. House and his friends had armed themselves with guns and pistols and had ridden through the country hunting for them, under the belief that they were hiding together in the neighborhood, or had fled the country together.

Now, if evidence was admitted to show that House had armed himself, and was hunting for Steadman under the impression that the latter had eloped with his wife, and was secreting himself in that vicinity, it is difficult to see upon what principle his threats in that connection were excluded. Accepting the theory of the government that mere threats, unaccompanied by acts of a threatening nature, were irrelevant to the question of defendant's guilt, it is not easy to understand how the acts themselves could be made pertinent without testimony tending to show the reason why House had armed himself, and, with other parties, was scouring the country for Steadman. Their statements in that connection would be clearly illustrative of the act in question, and a part of the *res gestæ*, within the rule laid down in *Lord George Gordon's Case*, 1 Greenl. Ev. § 108, and within all the authorities upon the subject of declarations as part of the *res gestæ*.

At the same time we recognize a certain discretion on the part of the trial judge to rule out this entire testimony, both of the acts and the declarations of House, if, in his opinion, they were so remote or insignificant as to have no legitimate tendency to show that House could have committed the murder. If, for instance, it were clearly proven that the murder was committed before the threats of House were uttered, or the two occurrences were so remote in time and place as to demonstrate that there could have been no connection between them, it would be the duty of the court to exclude the testi-

mony. But, if on the other hand, the time, and the circumstances attending the murder were uncertain or obscure, the conduct and threats of House might have a material bearing upon the identification of the murderer. It is held by some of the authorities that the question whether such evidence should be admitted or excluded, is to a certain extent a matter of discretion with the trial judge. *Shailer* v. *Bumstead,* 99 Mass. 112; *Thayer* v. *Thayer,* 101 Mass. 111; *Commonwealth* v. *Abbott,* 130 Mass. 472; *Commonwealth* v. *Ryan,* 134 Mass. 223; *McInturf* v. *The State,* 20 Tex. App. 335.

In the present case, however, it is assumed, both in the exception noted to the exclusion of the testimony, and in the briefs of counsel, to have been proven as a fact, by the witness Terry, that on the day of the disappearance of Steadman and Mrs. House, he saw Samuel House, her husband and several others, relatives and friends of House, riding around the neighborhood armed with Winchester guns and pistols, hunting for deceased and Mrs. House, who were then believed to have eloped together, or to be secreting themselves in the neighborhood; and although the testimony of Terry, as set forth in the bill of exceptions, fails to support this statement, or to show definitely what he did intend to swear to, yet assuming it to be as stated, we think that, if it were shown that House was in search of Steadman, his declarations as to his purpose in so doing stand upon the same basis, with regard to admissibility, as his conduct, and were a part of the *res gestæ.* But in the view we take of the next assignment we find it unnecessary to determine whether there was such error in ruling out this testimony as to require a reversal.

(3) The third assignment relates to the admission of the testimony of J. G. Ralls, an attorney at law, to which objection was made upon the ground that it related to a confidential communication made by the defendant, who had consulted Ralls as an attorney at law, and was therefore privileged. Ralls stated in substance that he was practising law at Muscogee; that defendant came to his office there between the time of Steadman's disappearance and the finding of his body, "and asked me if I was an attorney; I told him I was; he

said his name was Alexander, and he went on to state that he and his partner had some forty head of horses across the river, in partnership, and that some time before that, probably a week before, his partner was missing, and he hadn't heard from him. He says his partner had a brother in California, and he was afraid his brother would come up there and make some trouble about the horses; he stated at the time his partner had taken off the money, and he wanted to know if he could hold the horses so as to secure his part of the money. I asked him if the horses would pay him for his part, and he said it would; I told him to hold the horses; they could not take them until that was settled." It is evident from this statement that defendant consulted with Ralls as a legal adviser, and while, if he were guilty of the murder, it may have had a tendency to show an effort on his part to defraud his partner's estate, and to make profit out of his death, by appropriating to himself the partnership property, it did not necessarily have that tendency and was clearly a privileged communication. If he consulted him in the capacity of an attorney, and the communication was in the course of his employment, and may be supposed to have been drawn out in consequence of the relations of the parties to each other, neither the payment of a fee nor the pendency of litigation was necessary to entitle him to the privilege. *Williams* v. *Fitch*, 18 N. Y. 546; *Britton* v. *Lorenz*, 45 N. Y. 51; *Bacon* v. *Frisbie*, 80 N. Y. 394; *Andrews* v. *Simms*, 33 Arkansas, 771.

In the language of Mr. Justice Story, speaking for this court in *Chirac* v. *Reinicker*, 11 Wheat. 280, 294: "Whatever facts, therefore, are communicated by a client to a counsel solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent."

We are referred, however, to the case of *Queen* v. *Cox*, 14 Q. B. D. 153, as holding the doctrine that where a communication is made to counsel in furtherance of a scheme to commit a crime, the client is not entitled to the privilege. This was a Crown case reserved and argued before ten judges of the

Queen's Bench Division. The defendants Cox and Railton were indicted for a conspiracy to defraud one Munster. The facts stated show that Munster had obtained a judgment against Railton in an action for libel, upon which an execution had issued, which the sheriff proposed to levy upon the defendant's stock in trade. He was met, however, by a bill of sale from Railton to Cox, the other defendant, antedating the execution. It was claimed that the bill of sale was fraudulent and made for the purpose of depriving Munster of his rights under the judgment, and Railton and Cox were indicted for conspiracy. The question was whether an interview had by Railton and Cox with Goodman, a solicitor, as to what could be done to prevent the property from being seized under execution, was competent evidence, or was a privileged communication. No point was made that Goodman was not consulted as an attorney. The court unanimously held that the evidence was competent. Mr. Justice Stephen, who delivered the opinion of the court, said, in a very exhaustive discussion, that the question was, " whether, if a client applies to a legal adviser for advice intended to facilitate or to guide the client in the commission of a crime or fraud, the legal adviser being ignorant of the purpose for which his advice is wanted, the communication between the two is privileged ? We expressed our opinion at the end of the argument that no such privilege. existed. If it did, the result would be that a man intending to commit treason or murder might safely take legal advice for the purpose of enabling himself to do so with impunity, and that the solicitor to whom the application was made would not be at liberty to give information against his client for the purpose of frustrating his criminal purpose." pp. 165, 166. After citing and commenting upon a large number of cases, he comes to the conclusion that if the communication be made in furtherance of any criminal or fraudulent purpose, it is not privileged. This case, however, is clearly distinguishable from the one under consideration, in the fact that the solicitor was consulted with regard to a scheme to defraud, for which his clients were subsequently indicted and tried, and the testimony was offered upon that trial; while in this case the consultation

was had after the crime was committed, and was offered in evidence as an admission tending to show that defendant was concerned in the crime, or rather as a statement contradictory to one he had made upon the stand. Had he been indicted and tried for a fraudulent disposition of his partner's property, the case of *Queen* v. *Cox* would have been an authority in favor of admitting this testimony, but we think the rule announced in that case should be limited to cases where the party is tried for the crime in furtherance of which the communication was made.

Had the interview in this case been held for the purpose of preparing his defence, or even for devising a scheme to escape the consequences of his crime, there could be no doubt of its being privileged, although he had made the same statement, that his partner was missing and he had not heard from him. Now the communication in question was perfectly harmless upon its face. If it were true that his partner was missing, and he had not heard from him, and that Steadman had taken off the money, there was no impropriety in his consulting counsel for the purpose of ascertaining if he could hold the horses, so as to secure his part of it. Ralls asked him in that connection if the horses would pay him for his part, and defendant said they would; he then told him to hold the horses, that they could not take them until that was settled.

It is only by assuming that he was guilty of the murder that his scheme to defraud his partner becomes at all manifest. His statement that his partner was missing and that he had not heard from him, is the only material or relevant part of the conversation, and was plainly privileged.

*The judgment of the court below must be reversed, and the case remanded for a new trial.*

MR. JUSTICE GRAY was not present at the argument and took no part in the decision of this case.