### SMITH et al. v. UNITED STATES.*

#### (Circuit Court of Appeals, Ninth Circuit. March 13, 1916.)

#### No. 2576.

1. CONSPIRACY ⬅48—CONSPIRACY TO DEFRAUD UNITED STATES—QUESTIONS FOR JURY.

On a trial for conspiracy to defraud the United States out of a part of the customs duty on imported coal, whether the United States was defrauded in that some of the coal never reached the scales for weighing, and in that it paid drawbacks for coal delivered to steamers entitled to claim drawbacks in excess of the quantity actually delivered, and whether these results were brought about by a conspiracy between defendants *held* for the jury.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 108–111; Dec. Dig. ⬅48.]

2. CONSPIRACY ⬅43(10)—CUSTOMS DUTIES—FRAUD—INDICTMENT.

An indictment for conspiracy to defraud the United States of customs duties on imported coal, by preventing part of the coal from reaching the scales for weighing and by causing the payment of drawbacks for coal in excess of the quantity delivered to steamers entitled to claim drawbacks, was not sufficient if it merely charged in general terms a conspiracy to defraud the United States.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 86, 97; Dec. Dig. ⬅43(10).]

3. CRIMINAL LAW ⬅1032(5)—OBJECTIONS FOR PURPOSE OF REVIEW—INDICTMENT.

An indictment charged defendants with conspiring to defraud the United States of duties on coal imported into the United States by making and causing to be made false weights and false returns of weights of cargoes and importations of coal, and made like charges as to coal discharged into vessels entitled to claim a drawback. It further charged that defendants so manipulated the scales and weights and method of weighing thereon that they recorded the weights of coal desired by defendants, and not the true weight of the coal, and that they caused all coal weighed on scales upon which the coal handled by their company was weighed to be incorrectly measured and weighed, to the end and for the purpose that they, under the name and guise of such company, should

receive the profit and gain from such inaccurate and fraudulent weight. *Held* that, where no objection was made to the indictment before trial, or interposed to the introduction of testimony, and no request was made to limit the scope of the charge in the instructions of the court, and defendants were not misled to their prejudice, the indictment, though general in terms and lacking in particulars, was sufficient.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2627; Dec. Dig. ☞1032(5).]

4. CRIMINAL LAW ☞919(5)—ARGUMENT OF COUNSEL—TIME FOR OBJECTIONS.

An objection to argument of prosecuting counsel, first called to the attention of the court by a motion for a new trial, came too late.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2199; Dec. Dig. ☞919(5).]

5. CRIMINAL LAW ☞1156(1)—APPEAL—REVIEW—DENIAL OF NEW TRIAL.

While it would seem that an appellate court will review an order denying a new trial at least to the extent of determining whether the court below refused to receive and consider proper testimony, where the court considered all affidavits presented in support of such a motion, and after a full hearing denied the motion in the exercise of the discretion vested in it by law, and the circumstances did not plainly require an appellate court to review and reverse the order, it would not be disturbed.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3067; Dec. Dig. ☞1156(1).]

In Error to the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

James B. Smith and others were convicted of an offense, and they bring error. Affirmed.

McCutchen, Olney & Willard, Morrison, Dunne & Brobeck, A. P. Black, Stanley Moore and Samuel Knight, all of San Francisco, Cal., for plaintiffs in error.

Matt I. Sullivan and Theo. J. Roche, Sp. Asst. Attys. Gen., both of San Francisco, Cal., for the United States.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

RUDKIN, District Judge. The indictment in this case was returned under section 37 of the federal Penal Code of 1909. Act March 4, 1909, c. 321, 35 Stat. 1096 (Comp. St. 1913, § 10201). The charging part of the indictment, omitting mere formal parts and the overt acts, reads as follows:

"That the said defendants, and said divers other persons whose names are to said grand jurors unknown, did plan, confederate, conspire, and agree, under the guise and name of the said corporation, to wit, Western Fuel Company, to defraud the United States out of a large part of the import duties on coal imported and brought into the United States by said Western Fuel Company by itself and through other persons, firms, and corporations from divers foreign countries, ports, and places for said Western Fuel Company, and to defraud the United States out of a large portion of the duties due to the United States on divers shiploads and cargoes of coal so imported by said Western Fuel Company and other persons, firms, and corporations, as aforesaid, and coming into the port of San Francisco, by making, and causing to be made, false weights and false and fraudulent returns of weights of such

cargoes and importations of coal, and by further fraudulently weighing and causing to be weighed, by themselves and by the Pacific Mail Steamship Company, a corporation, and by other persons and corporations whose names are to the grand jurors aforesaid unknown, and for that reason not herein stated, and reported to the United States, the weights of all such importations of coal loaded from the bunkers and barges of said Western Fuel Company for fuel on board vessels propelled by steam, and engaged in trade with foreign countries and in trade between the Atlantic and Pacific ports of the United States, and which ships or vessels were registered under the laws of the United States; and, further, to defraud the United States by making, and causing to be made, false returns, weights, and entries of coal shipped and loaded aboard the transports of the United States Army Service and other government ships purchasing coal at San Francisco Harbor; and to that end, and for the purpose of carrying out such conspiracy, combination, and agreement, to maintain on the docks, wharves, and barges owned, operated, controlled, and occupied by said Western Fuel Company and by the said defendants at the port of San Francisco, in the state and Northern District of California, scales and weights which were to be, and were, fraudulently manipulated by the defendants, to the end that said scales should record the weights of said coal desired by the defendants, and not the true weights of the coal placed thereon, and the said defendants did so manipulate said scales and weights and the method of weighing thereon, so that said scales and weights did record the weights of coal desired by said defendants, and not the true weight of the coal so placed thereon, and to further cause fraudulent affidavits and statements to be made by the defendants and by each of them, to the officers of the government of the United States, and to other persons and corporations whose names are to the grand jurors aforesaid unknown, and for that reason not herein stated, and to the Pacific Mail Steamship Company, a corporation, organized and existing under and by virtue of the laws of the state of New York and engaged in the shipping and transportation of freight and passengers, with offices located in the city and county of San Francisco, and which operated, and still operates, American registered vessels engaged in foreign trade and buying coal from said Western Fuel Company for the purpose and to the end that said Pacific Mail Steamship should claim from the United States a greater rebate on the drawback of coal duties permitted where coal is loaded upon American registered vessels engaged in foreign trade than the true weight of said coal would permit said Pacific Mail Steamship Company to claim or was due the said Pacific Mail Steamship Company; and, further, to cause all coal weighed in, on or about the scales upon which the coal handled by said Western Fuel Company was weighed, to be incorrectly measured and weighed, to the end and for the purpose that the defendants, acting under the name and guise of said Western Fuel Company aforesaid, should receive the profit and gain to be made by such incorrect and fraudulent weight."

Eight defendants were originally named in the indictment. The defendant John L. Howard died during the trial; the defendants Sidney V. Smith, Robert Bruce, and Joseph L. Schmitt were acquitted by direction of the court; the defendant Edward J. Smith was found not guilty by the jury, and a verdict of guilty was returned against the three remaining defendants, James B. Smith, F. C. Mills, and E. H. Mayer. To reverse the judgment entered on this verdict the present writ of error was sued out.

The Western Fuel Company was incorporated during the latter part of the year 1902, and ever since its incorporation has been extensively engaged in the business of mining, importing, buying, and selling fuel coals. The company owns and operates mines at Namaimo and Northfield, British Columbia, but its principal place of business has been San Francisco, Cal. The plaintiff in error Smith was vice president and general manager of the company, and exercised a gen-

eral supervision over all the business and properties of the company, except the mines and mining operations in British Columbia. The plaintiff in error Mills was superintendent of the docks at San Francisco, and had general supervision over the bunkers and barges, the loading and unloading of coal, and over the employés engaged in that work. The plaintiff in error Mayer was check clerk. His general duties were to take the weights of the coal discharged from the vessels, in connection with the government weigher, and to superintend its distribution to the different bunkers, wharves, and yards.

[1] The testimony covers the principal activities of the Western Fuel Company between April 1, 1906, and December 31, 1912. Between these dates, inclusive of foreign coal on hand April 1, 1906, the company imported into the United States 2,159,551 tons of coal, as shown by the invoice weights, or 2,138,831 tons as shown by the outturn or ascertained weights upon which duty was paid to the government. About 70 per cent. of the coal thus imported came from British Columbia, 25 per cent. from Australia, and the remaining 5 per cent. from Japan. In the case of a majority of these importations the ascertained weight was less than the invoice weight. The total of these shortages amounted to 26,044 tons. In other instances, however, the ascertained weight exceeded the invoice weight. The total of these overages was 5,324 tons, leaving a net shortage of 20,720 tons, or approximately 1 per cent. In other words, on the total importations between April 1, 1906, and December 31, 1912, the invoice weights were 20,720 tons in excess of the ascertained weight upon which the duty was computed and paid. Between the same dates sales of foreign coal made from these importations, including a small quantity of coal destroyed by fire, and the coal on hand December 31, 1912, amounted to 2,200,827 tons, or 61,996 tons in excess of the ascertained weight. Between the same dates a total of 563,759 tons ascertained weight was laden on barges from vessels or bunkers for delivery to other vessels for fuel purposes. The total tonnage discharged from these barges was 596,982 tons, or a net overage of 33,223 tons. Of this overage 22,436 tons was discharged on vessels propelled by steam, engaged in trade with foreign countries or in trade between Atlantic and Pacific ports of the United States and registered under the laws of the United States, which were entitled to a drawback of the duties thus paid under the tariff acts of 1907 and 1909. There may be slight errors in these latter computations, as some discrepancies were pointed out during the trial; but it was and is practically conceded that the tonnage discharged from these barges exceeded the ascertained weight of the coal laden upon them by approximately 5 per cent.

A word now as to the manner in which coal is discharged from vessels and weighed by the government weigher, and as to the discharge of coal from barges onto other vessels and the mode of weighing. The imported coal was discharged at different ports such as Oakland, San Diego, and San Francisco; but as the greater part of the coal was discharged at the Folsom Street docks in San Francisco, and as the principal part of the testimony relates to operations

there, we will confine ourselves to a brief description of these docks. The Folsom Street docks are equipped with two sets of bunkers called inshore and offshore bunkers. The tracks upon which the coal cars operate are constructed above these bunkers. When the docks were taken over by the Western Fuel Company some years ago the tracks were planked over so that coal falling from the cars or escaping from the hoppers could not fall into the bunkers; but this permanent planking was removed by the Western Fuel Company and temporary planking substituted in its place. This temporary planking could be moved and replaced by the employés of the company from time to time, but for what purpose does not appear. The coal passed from the hoppers into cars on these tracks and the cars when loaded were drawn onto the scales by electric power and weighed by a government weigher, the weights being taken by the weigher and also by a representative of the Western Fuel Company, usually the plaintiff in error Mayer. As soon as the cars were weighed, they were taken to the different bunkers, or to the yards, and unloaded as Mayer might direct. In the coaling of the vessels of the Pacific Mail Steamship Company and others the coal was laden on barges from the offshore bunkers and discharged from the barges into the ship's bunkers by means of buckets having a capacity of half a ton or upwards. The government weigher was supposed to weigh 1 bucket in 15, or a round of 4 buckets in 60, and the remainder of the buckets were then averaged up with the buckets thus weighed for the purpose of ascertaining the entire quantity of coal discharged into the vessel. The weights taken by the government weigher were also taken by a representative of the Steamship Company, and upon these weights the drawback was paid to such vessels as were entitled to claim a drawback under the law. Up to this point there is little or no conflict in the testimony. It must not be understood, however, that the results obtained are anything more than approximate. The parties were dealing with a base commodity where strictly accurate weights were not taken or required. The coal was wet down from time to time to lay the dust, or to prevent spontaneous combustion, and was at all times exposed to the elements. The difference between the invoice weights and the outturn weights indicates but little, in view of the fact that in many instances the coal was not actually weighed at the foreign port. In a majority of cases the weight was merely estimated by the ship's scale, or by the draught of the ship. How accurate this is we do not know, but evidently it is only an approximation. The fact that a number of tons or a certain percentage was added to the weight thus ascertained does not remove the element of uncertainty. It also appears that the import coal discharged from vessels was weighed on a rising beam. Of course if the weights were accurately taken, the difference between a weight taken on a rising beam and a weight taken on an even beam would be slight; but much would depend on the care and skill of the operator. On the other hand, in the discharge of coal from barges to vessels the shovelers on the barges had more time to fill the buckets weighed than those which were not weighed by reason of the delay incident to the weighing, and naturally

the former would weigh heavier than the latter. If there was nothing in the case beyond this, we would have no hesitation in declaring that the government failed to make a case for the jury, and it is upon this claim that the principal assignment of error is based. For whether the discrepancy in the weights was caused by the elements, by flooding the coal with water, by incompetence or negligence on the part of the government weighers, or through the adoption of a faulty system, the plaintiffs in error are not answerable criminally unless they took some part in bringing these things about. But the testimony did not stop here. There was direct and positive testimony tending to show that at the Folsom Street docks coal was shoveled into the bunkers from the tracks without being weighed; that coal was run from the chutes or hoppers into the bunkers without being weighed; and that trainloads of coal were passed over the scales and dumped into the bunkers without being weighed—all under the express direction of the plaintiff in error Mayer. There was further testimony, tending to show that Mayer pressed his foot or leg against the scale rod from time to time, thus preventing the government weigher from taking accurate weights, and that he was cognizant of the existence of a bent link between two of the cars, which likewise caused inaccurate weights to be taken. There was also testimony tending to show that in discharging coal from the barges into the vessels of the Pacific Mail Steamship Company the buckets weighed were filled to overflowing, while the unweighed buckets were little more than two-thirds full. There was testimony tending to show that this practice was pursued continuously and uninterruptedly; that instructions to that effect were given on at least one occasion by the plaintiff in error Mills in relation to another vessel; that the books and records kept by Mills frequently showed a great disparity between the quantity of coal laden on the barges and the quantity of coal discharged therefrom; that reports showing these discrepancies were made daily to the plaintiff in error Smith and to the Western Fuel Company, and that each and every one of the plaintiffs in error were fully cognizant of these discrepancies, and it is not going too far to say that they were equally cognizant of the causes that produced them.

[2] From the foregoing statement it must be apparent that there was competent testimony tending to show: First, that the United States was actually defrauded, to some extent at least, by reason of the fact that a portion of the imported coal never reached the scales, was never weighed, and that no duty was paid thereon; and, second, that the United States was actually defrauded, to some extent at least, by reason of the fact that it paid drawbacks to steamers entitled to claim drawbacks for coal in excess of the quantity actually delivered to them. We think it equally manifest that there was sufficient testimony to warrant the jury in finding that these results were brought about by the wrongful concerted action of the plaintiffs in error and others, and that a conspiracy existed to that end. But it is claimed in this connection that no such frauds and no such conspiracy are charged in the indictment. It must be conceded that the charge is very general, and we cannot yield our assent to the claim on the part

of the government that an indictment in cases such as this need only charge in general terms a conspiracy to defraud the United States. Keck v. United States, 172 U. S. 434, 19 Sup. Ct. 254, 43 L. Ed. 505.

[3] The indictment in this case, however, charges that the parties accused, planned, confederated, conspired, and agreed together to defraud the United States out of a large part of the import duties on coal imported and brought into the United States by the Western Fuel Company "by making and causing to be made false weights and false and fraudulent returns of weights of such cargoes and importations of coal," and a like charge is made as to the coal discharged from barges into vessels entitled to claim a drawback. It is further charged that:

"The said defendants did so manipulate said scales and weights and method of weighing thereon, so that said scales and weights did record the weights of coal desired by said defendants, and not the true weight of the coal so placed thereon. * * * And, further, to cause all coal, weighed in, on, or about the scales upon which the coal handled by said Western Fuel Company was weighed, to be incorrectly measured and weighed, to the end and for the purpose that the defendants, acting under the name and guise of said Western Fuel Company aforesaid, should receive the profit and gain to be made by such incorrect and fraudulent weight."

No objection was made to the indictment before trial; no objection was interposed to the introduction of testimony under the indictment, and no request was made to limit the scope of the charge in the instructions of the court. In view of these facts, and of the further fact that the plaintiffs in error were not misled to their prejudice, we think the charge, though general in terms and entirely lacking in particulars, was sufficient.

[4] Certain rulings of the court, admitting and excluding testimony, are assigned as error; but these rulings were all unimportant. We observe no error in them; but, even if the rulings were erroneous, the errors were not of a prejudicial kind. Another assignment is based on the argument of counsel to the jury. The language objected to was first called to the attention of the court by the motion for a new trial. The objection came too late.

"When the defendant's counsel in a criminal trial fails to at once call the attention of the court to remarks by the prosecuting officer which are supposed to be objectionable, and to request its interposition, and, in case of refusal, to note an exception, an assignment of error in regard to them is untenable." Crumpton v. United States, 138 U. S. 361, 11 Sup. Ct. 355, 34 L. Ed. 954.

"But here no objection was made and no complaint urged until upon motion for a new trial. Nothing is better settled than that the defendant who deems himself prejudiced by the language of counsel should promptly and publicly object and point out the language deemed improper, and then take exception if the trial judge fail to condemn it. It is too late to predicate error upon the refusal of the trial judge to grant a new trial on account of a complaint made only after verdict and upon a motion for a new trial." Lurton, J., in Chadwick v. United States, 141 Fed. 225, 246, 72 C. C. A. 343, 364.

[5] The last error assigned is based on the ruling of the court denying a motion for a new trial. There is a seeming conflict of authority on the question as to how far, if at all, such a ruling may be re-

viewed on writ of error. Thus in Holder v. United States, 150 U. S. 91, 14 Sup. Ct. 10, 37 L. Ed. 1010, the court said:

"It has also been settled, by a long line of decisions of this court, that the denial of a motion for a new trial cannot be assigned for error."

In Wheeler v. United States, 159 U. S. 523, 16 Sup. Ct. 93, 40 L. Ed. 244, the court said:

"Another contention is that the court erred in overruling the motion for a new trial, but such action, as has been repeatedly held, is not assignable as error."

In Addington v. United States, 165 U. S. 185, 17 Sup. Ct. 288, 41 L. Ed. 679, the court said:

"The first 10 assignments of error are based upon a bill of exceptions, setting out simply the grounds upon which the accused asked that a new trial be granted to him. It is only necessary to say that the refusal of the court to grant a new trial cannot be assigned for error in this court."

Similar language may be found in many other decisions, both of the Supreme Court and of the Circuit Courts of Appeals for the different circuits. Yet in Mattox v. United States, 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917, the Supreme Court reviewed an order refusing a new trial because the court below had excluded certain affidavits, and in passing upon the motion exercised no discretion in respect of the matter therein stated. The only distinction between that case and the other cases cited is thus pointed out by the Chief Justice:

"The allowance or refusal of a new trial rests in the sound discretion of the court to which the application is addressed, and the result cannot be made the subject of review by writ of error. Henderson v. Moore, 5 Cranch, 11 [3 L. Ed. 22]; Newcomb v. Wood, 97 U. S. 581 [24 L. Ed. 1085]; but in the case at bar the District Court excluded the affidavits, and in passing upon the motion did not exercise any discretion in respect of the matter stated therein."

In McDonald v. Pless, 238 U. S. 264, 35 Sup. Ct. 783, 59 L. Ed. 1300, the court again reviewed an order denying a motion for a new trial. In fact that was the only question before the court. The lower court had refused to receive affidavits of jurors tending to show that their verdict was reached by lot, and its action in so doing was affirmed by the Supreme Court. It seems to be established, therefore, that an appellate court will review such an order, at least to the extent of determining whether the court below refused to receive and consider proper testimony. In the case of United States v. Holt, 218 U. S. 245, 251, 31 Sup. Ct. 2, 5 [54 L. Ed. 1021, 20 Ann. Cas. 1138], the court said:

"We are dealing with a motion for a new trial, the denial of which cannot be treated as more than matter of discretion or as ground for reversal, except in very plain circumstances indeed. Mattox v. United States, 146 U. S. 140 [13 Sup. Ct. 50, 36 L. Ed. 917]. See Holmgren v. United States, 217 U. S. 509 [30 Sup. Ct. 588, 54 L. Ed. 861, 19 Ann. Cas. 778]. It would be hard to say that this case presented a sufficient exception to the general rule."

Perhaps the true distinction is stated by the court in Felton v. Spiro, 78 Fed. 576, 581, 24 C. C. A. 321, 327, where the court, speaking through Taft, J., said:

"A motion for a new trial is, of course, addressed to the discretion of the court, and, if the court exercises its discretion, and either grants or denies the motion, its action is not the subject of review. This is so well settled that it is unnecessary to cite authorities upon the point. But the motion for a new trial is a remedy accorded to a party litigant for the correction by the trial court of injustice done by the verdict of a jury. It is one of the most important rights which a party to a jury trial has. It is a right to invoke the discretion of the court to decide whether the injustice of the verdict is such that he ought to have an opportunity to take the case before another jury. If, now, in exercising this discretion, it is the duty of the court to consider whether the verdict was against the great weight of the evidence, and he refuses to consider the evidence in this light on the ground that he has no power or discretion to do so, it is clear to us that he is depriving the party making the motion of a substantial right, and that this may be corrected by writ of error. In Mattox v. United States, 146 U. S. 140 [13 Sup. Ct. 50, 36 L. Ed. 917], it was held that, where the trial court excluded affidavits offered in support of a motion for a new trial, and in passing upon the motion exercised no discretion in respect of the matters stated in the affidavits, the question of the admissibility of the affidavits was preserved for the consideration of the Supreme Court on writ of error, notwithstanding the general rule that the allowance or refusal of a new trial rests in the sound discretion of the trial court. This furnishes direct support for the view that the refusal of the trial court to consider at all as a ground for new trial that the verdict was contrary to the evidence may be assigned for error here."

The motion for a new trial in this case was based largely on the ground that certain of the jurors had read numerous articles published in two of the San Francisco daily papers during the trial, commenting on the case, and an article in an Oakland paper, commenting on a somewhat similar case in another jurisdiction. Any attempt on our part to give even the substance of these publications, covering a period of almost two months, would unduly extend this opinion. Suffice it to say that the court below considered all affidavits presented in support of the motion, and after a full hearing denied the motion in the exercise of the discretion vested in it by law. And, even assuming now that this court would review and reverse such an order, "in very plain circumstances indeed," as intimated in the Holt Case, no such situation is presented. We find no error in the record and the judgment of the court below is therefore affirmed.