**UNITED STATES of America**

v.

**GRAND JURY INVESTIGATION.**

**No. Misc. 6211.**

United States District Court,
W. D. Pennsylvania.

Aug. 27, 1975.

Blair Griffith, U. S. Atty., Stephen I. Goldring, Justice Dept., Pittsburgh, Pa., for plaintiff.

Harold Gondelman, Joseph G. Kanfoush, William F. Manifesto, Donald Hershman, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

SNYDER, District Judge.

We are here concerned with problems arising out of a Government Motion to Compel Testimony from attorneys summoned to appear before a Federal Grand Jury in the Western District of Pennsylvania. The attorneys when questioned all invoked the attorney-client privilege at the direction of their clients.

## BACKGROUND

A Special Grand Jury has been investigating George Edward Lee and others for possible violations of the Internal Revenue laws of the United States. The Grand Jury narrowed its inquiry to the accuracy of Lee's tax returns for the years 1968 through 1974, to determine whether he had sources of income which were not reported or had made payments in excess of reported income. During the course of the investigation, information was sought concerning various business ventures in which Lee was believed to have a substantial financial interest, and in which businesses he had utilized the services of attorneys Carl M. Janav-itz, Paul A. Love, Charles N. Caputo, Stanley D. Kahn II, and Donald S. Hershman.

On March 20 and 21, 1975, these attorneys were summoned by subpoena to appear and bring with them records of various corporations and business activities in which it was believed Lee had an undisclosed financial interest. These subpoenas were in a form requiring production of:

"All books, records, correspondence and memoranda relating to transactions with, by or for George E. Lee in his own name or in the names of * * * or under any other designation known for the years 1968 through and including 1974. In particular, it is requested that you furnish the following:

1. Dates, amounts and purpose of legal fees paid;

2. Settlement sheets, sales agreements, purchase money mortgages, deeds, mortgage bonds, deeds of Trust, Sheriff's deeds, liquor licenses, state and Federal Estate tax records, insurance records, trust account records, bank accounts (ledgers, cancelled checks and deposits), powers of attorney, personal (business) notes and repayment records and escrow accounts; and

3. Incorporating papers, minutes, stock certificates, list of officers, corporate bank records (ledgers, cancelled checks and deposits)."

At the request of both the Government and the attorneys and by Special Order of Court, an *in camera* inspection of the transcript of the Grand Jury proceedings was ordered. The Court found that the attorneys had refused to identify their clients, and refused to surrender any documents in their possession which might have involved any client. They further refused to reveal whether they represented any individuals believed to be associated with Lee or any corporations named in the subpoena, or discuss fees paid, or even explain matters of public record such as the listing of the

attorney's office as the incorporating office. The attorneys were all asked by the Assistant United States Attorney:

". . . any questions that I would ask you concerning the individuals or corporations named in the subpoena, you would invoke the attorney-client privilege concerning them and refuse to answer any questions at all concerning them?"

They all answered this question affirmatively, having received a letter dated March 19, 1975 from Alan Brunwasser, Esquire, now representing all of the individuals identified in the subpoena in another related matter, instructing the attorneys that his clients were specifically invoking the attorney-client privilege and that the attorneys were not authorized to disclose any information protected by the privilege.

## DISCUSSION

█ This Court conceives of no purpose in extensively discussing the extremely interesting but difficult question of the extent to which the attorney-client privilege should apply in the Federal Court.[1] It is sufficient here to set forth that in Federal criminal cases there is a Federal interest in the application of a uniform law of Federal privilege, since all of such cases are of necessity grounded upon Federal Statutes. U.S.Code Cong. & Admin.News at p. 7051 (1974); *Colton v. United States,* 306 F.2d 633 (2d Cir. 1962), *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *In Re Albert Lindley Lee Memorial Hospital,* 209 F.2d 122 (2d Cir. 1953), *cert. denied, Cincotta v. United States,* 347 U.S. 960, 74 S.Ct. 709, 98 L. Ed. 1104 (1954); *United States v. Baucus,* 377 F.Supp. 468 (D.Mont.1974); *J. P. Foley & Co., Inc. v. Vanderbilt,* 65 F. R.D. 523, 526, n.1 (S.D.N.Y.1974); *Boyd v. Gullett,* 64 F.R.D. 169 (D.Md. 1974).

The privilege afforded to *confidential communications* between client and attorney is well established in the Federal Courts and was recognized at Common Law. *Prichard v. United States,* 181 F. 2d 326 (6th Cir. 1950), *aff'd* 339 U.S. 974, 70 S.Ct. 1029, 94 L.Ed. 1380 (1950). Although the law strives to ascertain the truth, there exists a countervailing policy of insuring the right of every person to freely and fully confer with and confide in a person having knowledge of the law and skilled in its practice, so that adequate advice may be received and proper defenses asserted. *Baird v. Koerner,* 279 F.2d 623 (9th Cir. 1960); *United States v. Pape,* 144 F.2d 778 (2d Cir. 1944), *cert. denied* 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944). Such assistance can be given only when the client is free from the consequences of apprehension or disclosure by reason of the subsequent statements of his own skilled lawyer.

During the appearance before the Special Grand Jury here, and at the Hearing before this Court, the Government recognized the possible existence of an attorney-client relationship, but urged that no privilege applies to the questions put to these attorneys because the answers would "not fall within the proper scope of the attorney-client privilege."

In support of their position, the Government cites *United States v. United Shoe Machinery Corporation,* 89 F.Supp. 357 (D.Mass.1950), a civil anti-trust suit in which the Government offered in evidence thousands of strictly intra-corporate documents. Judge Wyzanski stated (at pp. 358–359):

"The rule which allows a client to prevent the disclosure of information which he gave to his attorney for the purpose of securing legal assistance is founded upon the belief that it is necessary 'in the interest and administra-

---

1. As indicated by the legislative history of the new Federal Rules of Evidence (effective July 1, 1975), the attorney-client privilege as first drafted came in for much criticism. See S.Rep. No. 93–1277, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin. News, p. 7051 (1974).

tion of justice'. *Hunt v. Blackburn,* 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488. As stated in the Comment to Rule 210 of the A.L.I. Model Code of Evidence: 'In a society as complicated in structure as ours and governed by laws as complex and detailed as those imposed upon us, expert legal advice is essential. To the furnishing of such advice the fullest freedom and honesty of communication of pertinent facts is a prerequisite. To induce *clients* to make such communications, the privilege to prevent their later disclosure is said by courts and commentators to be a necessity. The social good derived from the proper performance of the functions of lawyers acting for their clients is believed to outweigh the harm that may come from the suppression of the evidence in specific cases.' [Emphasis added.] But the privilege should be strictly construed in accordance with its object. *People's Bank v. Brown,* 3 Cir., 112 F. 652.

Since this memorandum examines in turn the asserted application of this privilege to different classes of documents, it is unnecessary to try to state at the outset and with precision every qualification necessary to found a justified claim of privilege. It will be enough now to note in general, and later to apply in detail, the main qualifications which are necessary. The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

We note the early case of *Alexander v. United States,* 138 U.S. 353, 11 S.Ct. 350, 34 L.Ed. 954 (1891), where the lower court in a murder trial admitted into evidence a statement made by the defendant to an attorney, given after the death of the victim. The statement, admitted over an objection of confidential communication, was one from which it could be inferred that the defendant stood to profit from the victim's death, and the Court, through Mr. Justice Brown, clearly set forth the parameters of the attorney-client privilege as it was then understood (138 U.S. at p. 357, 11 S.Ct. at p. 352, 34 L.Ed. at pp. 957–960):

"The third assignment relates to the admission of the testimony of J. G. Ralls, an attorney at law, to which objection was made upon the ground that it related to a confidential communication made by the defendant, who had consulted Ralls as an attorney at law, and was therefore privileged. Ralls stated in substance that he was practicing law at Muscogee; that defendant came to his office there between the time of Steadman's disappearance and the finding of his body, 'and asked me if I was an attorney; I told him I was; he said his name was Alexander, and he went on to state that he and his partner had some forty head of horses across the river, in partnership, and that some time before that, probably a week before, his partner was missing, and he hadn't heard from him. He says his partner had a brother in California, and he was afraid his brother would come up there and make some trouble about the horses; he stated at the time his partner had taken off the money, and he wanted to know if he could hold the horses so as to secure his part of the money. I asked him if the horses would pay him for his part, and he said it would; I told him to hold the

horses; they could not take them until that was settled.' It is evident from this statement that defendant consulted with Ralls as a legal adviser, and while, if he were guilty of the murder, it may have had a tendency to show an effort on his part to defraud his partner's estate, and to make profit out of his death, by appropriating to himself the partnership property, it did not necessarily have that tendency, and was clearly a privileged communication. If he consulted him in the capacity of an attorney, and the communication was in the course of his employment, and may be supposed to have been drawn out in consequence of the relations of the parties to each other, neither the payment of a fee nor the pendency of litigation was necessary to entitle him to the privilege. *Williams v. Fitch,* 18 N.Y. 546; *Britton v. Lorenz,* 45 N.Y. 51; *Bacon v. Frisbie,* 80 N.Y. 394; *Andrews v. Simms,* 33 Ark. 771.

In the language of Mr. Justice Story, speaking for this court in *Chirac v. Reinicker* [24 U.S. 280], 11 Wheat. 280, 294 [6 L.Ed. 474, 477]: 'Whatever facts, therefore, are communicated by a client to a counsel solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent.'

We are referred, however, to the case of *Queen v. Cox,* 14 Q.B.D. 153, as holding the doctrine that where a communication is made to counsel in furtherance of a scheme to commit a crime, the client is not entitled to the privilege. This was a crown case reserved and argued before ten judges of the Queen's Bench Division. The defendants Cox and Railton were indicted for a conspiracy to defraud one Munster. The facts stated show that Munster had obtained a judgment against Railton in an action for libel, upon which an execution had issued, which the sheriff proposed to levy upon the defendant's stock in trade.

He was met, however, by a bill of sale from Railton to Cox, the other defendant, antedating the execution. It was claimed that the bill of sale was fraudulent, and made for the purpose of depriving Munster of his rights under the judgment, and Railton and Cox were indicted for conspiracy. The question was whether an interview had by Railton and Cox with Goodman, a solicitor, as to what could be done to prevent the property from being seized under execution, was competent evidence, or was a privileged communication. No point was made that Goodman was not consulted as an attorney. The court unanimously held that the evidence was competent. *Mr. Justice* Stephen, who delivered the opinion of the court, said, in a very exhaustive discussion, that the question was, 'whether, if a client applies to a legal adviser for advice intended to facilitate or to guide the client in the commission of a crime or fraud, the legal adviser being ignorant of the purpose for which his advice is wanted, the communication between the two is privileged? We expressed our opinion at the end of the argument that no such privilege existed. If it did, the result would be that a man intending to commit treason or murder might safely take legal advice for the purpose of enabling himself to do so with impunity, and that the solicitor to whom the application was made would not be at liberty to give information against his client for the purpose of frustrating his criminal purpose.' After citing and commenting upon a large number of cases, he comes to the conclusion that, if the communication be made in furtherance of any criminal or fraudulent purpose, it is not privileged. This case, however, is clearly distinguishable from the one under consideration, in the fact that the solicitor was consulted with regard to a scheme to defraud, for which his clients were subsequently indicted and tried, and the testimony was offered upon that trial;

while in this case the consultation was had after the crime was committed, and was offered in evidence as an admission tending to show that defendant was concerned in the crime, or rather as a statement contradictory to one he had made upon the stand. Had he been indicted and tried for a fraudulent disposition of his partner's property, the case of *Queen v. Cox* would have been an authority in favor of admitting this testimony, but we think the rule announced in that case should be limited to cases where the party is tried for the crime in furtherance of which the communication was made.

Had the interview in this case been held for the purpose of preparing his defense, or even for devising a scheme to escape the consequences of his crime, there could be no doubt of its being privileged, although he had made the same statement, that his partner was missing and he had not heard from him. Now the communication in question was perfectly harmless upon its face. If it were true that his partner was missing, and he had not heard from him, and that Steadman had taken off the money, there was no impropriety in his consulting counsel for the purpose of ascertaining if he could hold the horses, so as to secure his part of it. Ralls asked him in that connection if the horses would pay him for his part, and defendant said they would; he then told him to hold the horses, that they could not take them until that was settled.

It is only by assuming that he was guilty of the murder that his scheme to defraud his partner becomes at all manifest. His statement that his partner was missing and that he had not heard from him is the only material or revelant part of the conversation, and was plainly privileged."

The Court spoke in terms of "communication by a client to a counsel", and we believe this to be the modern rule as well.

Another especially instructive case is *Schwimmer v. United States,* 232 F.2d 855 (8th Cir. 1956), *cert. denied* 352 U. S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956), wherein the District Court denied an attorney's motion to quash a subpoena issued by a grand jury investigating tax evasion and official corruption. The grand jury desired to have produced the records of Attorney Schwimmer as a means of obtaining information regarding the tax affairs of Schwimmer's clients and his handling of their situations. Among the matters which the grand jury was endeavoring to determine was what, if anything, Schwimmer had done in official circles to effect the disposition of a previous tax difficulty encountered by the President of Shu-Stiles, Inc. The Court there stated *inter alia,* as follows (at pp. 863, 864):

"In the present situation, we do not believe that the scope of the second subpoena can be said to have involved an unreasonable margin of reach as to either material, parties or time, in respect to the investigation of Schwimmer's handling of the affairs of Sachs, Shu-Stiles, Inc., and Mrs. Taylor. The required production of an attorney's files of a specific client's affairs, for a reasonably limited period of time, in a grand jury's investigation of incidents involved in the attorney's handling of some of those affairs, does not impress, abstractly and without any demonstration, as constituting one of such unwarranted scope or of such substantial, apparent irrelevancy as to be generally unreasonable. Nor can the call for papers here, extending back to September 1, 1945, be said to represent an unreasonable period of time in the situation involved, in view of the showing on the hearing that the income-tax evasions involved against Sachs and Shu-Stiles, Inc., had been commenced to be investigated in 1948. Also, clearly, the requiring of Schwimmer's files and papers relating to the affairs of Sachs, Shu-Stiles, Inc., and Mrs. Taylor, either directly

or as a matter of relationship on the part of any person or corporation thereto, was of sufficient definiteness and limitation to be reasonable in its identification and scope of parties as to whom production was to be made.

\*   \*   \*   \*   \*   \*

The privilege thus is one that exists for the benefit of the client and not the attorney. *Chirac v. Reinicker*, 11 Wheat. 280, 294, 6 L.Ed. 474. But the attorney has the duty, upon any attempt to require him to testify or produce documents within the confidence, to make assertion of the privilege, not merely for the benefit of the client, but also as a matter of professional responsibility in preventing the policy of the law from being violated. 'The seal of the law once fixed upon (such a privileged communication) remains forever, [and for every purpose] unless removed by the party in whose favor it is there placed.' 58 Am.Jur., Witnesses, § 467.

Removal of the privilege, however, requires no particular formality on the part of the client. 'The client may waive the protection of the rule. The waiver may be express or implied.' *Blackburn v. Crawfords*, 3 Wall. 175, 194, 18 L.Ed. 186. Assertion of the privilege by an attorney, upon any testimony or production of documents being required of him, makes the question of waiver on the part of the client one for collateral determination by the court. As a collateral question, the court has discretion or latitude in the receiving of proof. It is not bound by the technical rules of evidence under which primary and corollary facts are required to be established. The question with which it is concerned is not whether waiver is capable of establishment by formal legal game, but whether it in fact exists, on satisfied conviction, from any credible and persuasive elements and implications shown. And such a determination of waiver as a collateral fact will, if it has a rational basis on general probative values of natural experience, be accepted as conclusive on any attempted review.

Further, in any assertion of the attorney-client privilege to avoid production of subpoenaed documents, it is to be remembered that existence of the privilege is not a basis for keeping the documents from having to be brought before the court. The privilege is not self-operative against a judicially required production, since the court is entitled to an opportunity to make inspection of any such documents in order to satisfy itself that they are in fact privileged. *Brown v. United States*, 276 U.S. 134, 144, 48 S.Ct. 288, 72 L.Ed. 500. ' \* \* \* the individual citizen may not resolve himself into a court, and himself determine [a question of privilege as to] the contents of books and papers required to be produced.' *Commonwealth v. Southern Express Co.*, 160 Ky. 1, 3, 169 S.W. 517, 518, L.R.A. 1915B, 913."

█ We ascribe fully to what was said in a comprehensive opinion by Judge Shientag in *People ex rel. Vogelstein v. Warden of County Jail*, 150 Misc. 714, 270 N.Y.S. 362 (S.Ct.1934), *aff'd* 242 App.Div. 611, 271 N.Y.S. 1059 (1st Dep't 1934), where he states as follows (150 Misc. pp. 717–718, 721, 270 N.Y.S. pp. 367, 371):

"There is nothing in the books to show that the privilege was to extend to the fact of the retention of counsel. No point is made that the employment of counsel should be shrouded with secrecy. The retention of counsel was to call the privilege into operation. The privilege itself was to extend only to communications between a client and an attorney who had been retained. *The name or identity of the client was not the confidence which the privilege was designed to protect; the statements of the client for the purpose of seeking advice from his counsel were the disclosures which were to be kept secret.* . . .

\* \* \* \* \* \*

The conclusion reached would seem to be inevitable, if we are to maintain the honor of the profession, and make an *officer of the court* an agency to advance the ends of justice, rather than to be used as an instrument to subvert them. The identity of an employer or client who retains a lawyer to act for him or for others in a civil or criminal proceedings should not be veiled in mystery. . . . Disclosure should be made. . . ." (Emphasis added.)

In *Mauch v. Commissioner of Internal Revenue*, 113 F.2d 555 (3d Cir. 1940), our Circuit dealt with an action against an attorney charged with tax fraud who refused to state the source of certain money, alleging it belonged to clients, but then refused to state who the clients were or what was the nature of their relationship claiming the privilege of a confidential relationship. The Court struck down that defense and stated (at pp. 556–557):

> "[A client] may object to her neighbors knowing that she has been in to consult [an attorney]. She will object much more to their knowing what she said to [the attorney]. We think the privilege must be shaped and the balance struck accordingly. The slight, though real, objection of one actual client must yield to any great interest of that body of prospective clients, the public. Such an interest appears most certainly where, as here, the claimed protection includes the attorney charged with defrauding that public. . . . Here, [the administration of justice] requires disclosure."

*Accord: Tomlinson v. United States*, 68 U.S.App.D.C. 106, 93 F.2d 652 (1937), *cert. denied* 303 U.S. 646, 58 S.Ct. 645, 82 L.Ed. 1107 (1938).

The Second Circuit in *United States v. Pape, supra,* compelled an attorney to disclose that the defendant had retained him to appear for a prostitute in an earlier action in the District of Columbia. Based on that testimony, the defendant was convicted of transporting a woman in interstate commerce for the purposes of prostitution. The Court asserted that "relevant evidence is freely admissible, except as it is privileged; and the privilege extends only so far as the policy behind it demands." 144 F.2d at p. 783. The Court found that it was not the purpose of the privilege to "shield guilt" and demanded disclosure.

Similarly in *Behrens v. Hironimus*, 170 F.2d 627 (4th Cir. 1948), the Court held in a habeas corpus proceeding that a prisoner failed to prove she was denied the assistance of counsel. Her attorney was compelled to testify that she had been consulted by the prisoner and had given her advice; this testimony was relevant and important as the petitioner had strenuously contended that she had acted all through the proceeding without the benefit of counsel. The Court, quoting 70 Corpus Juris, Witnesses § 502, stated as follows (at p. 628):

> ". . . The existence of the relation of attorney and client is not a privileged communication. The privilege pertains to the subject matter, and not to the fact of the employment as attorney, and since it presupposes the relationship of attorney and client, it does not attach to the creation of that relationship. So, ordinarily, the identity of the attorney's client, or the name of the real party in interest, and the terms of the employment will not be considered as privileged matter. The client or the attorney may be permitted or compelled to testify as to the fact of his employment as attorney, or as to the fact of his having advised his client as to a certain matter, or performed certain services for the client \* \* \*."

In *National Union F. Ins. Co. of Pittsburgh v. Aetna Cas. & S. Co.*, 127 U.S.App.D.C. 364, 384 F.2d 316 (1967), there was an appeal from a judgment granted to the insurer in an attachment proceeding initiated by the insured. The Court found it necessary to discuss

the evidence and stated as follows (n.4 pp. 317–318):

"We agree with the District Court that the letters sent by appellant to Hyde could be considered on the question whether appellant had authorized Scott's defense on the third-party complaint. The attorney-client privilege did not prevent their use for this purpose. As the District Judge pointed out, this correspondence revealed only the fact of appellant's authorization to Hyde to proceed with the defense; in no way did it disclose the strategy, legal theory or substance of that defense. *Walker v. American Ice Co.*, 254 F.Supp. 736, 738–39 (D.D.C. 1966). *See generally* 8 *Wigmore, Evidence* § 2292 (McNaughton rev. 1961). *The fact that an attorney-client relationship has arisen and the specific authorization for its creation are not, generally speaking, privileged subjects. See Mauch v. Commissioner of Internal Revenue*, 113 F.2d 555 (3d Cir. 1940); *Behrens v. Hironimus*, 170 F.2d 627, 628 (4th Cir. 1948); *Willard C. Beach Air Brush Co. v. General Motors Corp.*, 118 F.Supp. 242 (D.N.J.1953), *aff'd* 214 F.2d 664 (3d Cir. 1954); *Magida on Behalf of Vulcan Detinning Co. v. Continental Can Co.*, 12 F.R.D. 74 (S.D.N.Y.1951). *See also Catlog Ass'n v. A. Eberly's Sons, Inc.*, 60 App.D.C. 216, 50 F.2d 981 (1931)." (Emphasis added.)

Finally, in the recent case of *In Re Semel*, 411 F.2d 195 (3d Cir. 1969) *cert. denied* 396 U.S. 905, 90 S.Ct. 220, 24 L. Ed.2d 181 (1969), Judge Ganey was called upon to decide the appeal from a bankruptcy referee's order requiring the bankrupt to prepare a list of pending cases in his law practice and set forth the fees which were due on those cases as of the date of his petition in bankruptcy. In upholding the order, Judge Ganey stated (at pp. 197–198):

"The bankrupt also urges that he is not required to list cases pending in his office because information about such matters involves privileged communications between him and his clients. All fees and commissions earned and accrued prior to bankruptcy, or relating to services already performed, even though they may be paid thereafter, are assets of the bankrupt estate. *Parkford v. C. I. R.*, 133 F.2d 249, 146 A.L.R. 57 (9 Cir. 1943), *cert. denied* 319 U.S. 741 [63 S.Ct. 1029, 87 L.Ed. 1698]; *In re Austin*, 42 F.Supp. 889 (E.D.N.Y., 1942); 4A *Collier on Bankruptcy* (14 Ed.) ¶ 70.34. *In the absence of unusual circumstances, the fact of a retainer, the identity of the client, the conditions of employment and the amount of the fee do not come within the privilege of the attorney-client relationship. Mauch v. C. I. R.*, 113 F.2d 555 (3 Cir. 1940); *United States v. Pape*, 144 F.2d 778, 782–783 (2 Cir. 1944); *Colton v. United States*, 306 F.2d 633 (C.A.2, 1962); *Wirtz v. Fowler*, 372 F.2d 315, 332–333 (C.A.5, 1966); *In re Wasserman*, 198 F.Supp. 564 (D.C.D.C.1961). The determination that the facts relating to a particular retainer comes within the privilege is to be made by the referee in the first instance. Presently, there is nothing in the record upon which such a determination can be made. The mere assertion of an attorney-client relationship is not enough. It may turn out that in some of the cases the bankrupt has earned nothing at the time of the filing of his petition. See, for example, *In re Coleman*, 87 F.2d 753 (2 Cir. 1937). But here again the responsibility for that determination is upon the trustee. The bankrupt must supply the information even though it may be of no value to the bankrupt's estate." (Emphasis added.)

■ Our review of authorities herein discussed demonstrates that at the base of the attorney-client privilege lies the policy that one who seeks advice or aid from a lawyer should be completely free of any fear that his secrets will be uncovered. The privilege, one of ancient origin, was recognized in England in the

reign of Elizabeth I, but was then founded upon the honor of the attorney rather than in the apprehensions of his client. *See* 8 *Wigmore on Evidence* §§ 2290–2291 (McNaughton rev. ed. 1961); *People ex rel. Vogelstein v. Warden of County Jail, supra,* 150 Misc. at pp. 714, 716–717, 270 N.Y.S. 362.[2]

█ We have carefully examined the questions set forth in the Appendix to the Government's Memorandum of Law and conclude that they are not within the scope of the attorney-client privilege as interpreted by this Circuit, *In Re Semel, supra,* or by other Courts considering the question. The answers would not breach any confidence which the privilege, as historically developed and consistently applied, is designed to protect. The Court will therefore grant the Government's Motion to Compel Testimony from the named attorneys, upon submission by the Government of an appropriate Order drawn in accordance with this Opinion.[3]

---

2. An enlightening case note on the identity of the client as a privileged communication is found at 7 *N.Y.L.F.* 97 (1961).

3. We have reviewed with considerable interest and find nothing contrary to our opinion in excellent reviews of the attorney-client privilege. See Gardner, "Agency Problems in the Law of Attorney-Client Privilege", 42 *U.Det.L.J.* 1, 105, 253, 473, 553 (1964–1965); Gardner, "A Re-evaluation of the Attorney-Client Privilege," 8 *Vill.L.Rev.* 279, 447 (1963); and Annot., 9 A.L.R.Fed. 685 (1971).