**UNITED STATES of America**

v.

**Marzell PETERSON, Appellant.**

**No. 73–1921.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 22, 1974.

Judgment June 30, 1975.

Opinion July 18, 1975.

Bradley G. McDonald, Washington, D. C. (appointed by this Court) for appellant.

E. Lawrence Barcella, Jr., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and John O. Clarke, Jr., Asst. U. S. Attys., were on the brief for appellee. Harold H. Titus, Jr., U. S. Atty., at the time the record was filed, also entered an appearance for appellee.

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, and JUS-

TICE,* United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by Senior Circuit Judge DANAHER.

DANAHER, Senior Circuit Judge:

This appellant, jointly tried before a jury with co-defendants Carter and Patterson, was convicted of unlawful receipt and possession of property of the United States.[1] The appeals of the several accused have been consolidated by order of this court. The opinion[2] of Judge Justice has set forth in detail the circumstances predicating the several indictments. We need now only to recapitulate such facts as bear upon Peterson's claims of error.

# I

The burglary of the Arms Room at the Walter Reed Hospital on June 29, 1971, had resulted in the theft of some fifteen M–14 rifles, ten shotguns and other Government property of a total value in excess of $1800. The perpetrators had left on a desk in the Arms Room a drawing of a face with wording "King Kong is Black." A jury might reasonably deduce that such a legend intentionally projected symbolic significance. Guards at the Walter Reed reservation had seen two automobiles being rapidly driven from the premises by two men accompanied, perhaps, by a third companion. No other substantial evidence as to the identity of the perpetrators was then or thereafter available until February 9, 1972, when we first learn of this appellant Peterson.

# II

Metropolitan Police Officer Bennett alone in a scout car was patrolling the 16th Street area about 1:30 a. m. on February 9, 1972. He then sighted two men, one carrying a .12-gauge shotgun and the other armed either with a rifle

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. 18 U.S.C. § 641.

2. See United States v. Carter, 173 U.S.App. D.C. ——, 522 F.2d 666, and United States v. Patterson, 173 U.S.App.D.C. ——, 522 F.2d 666, both decided today.

or a small-bore shotgun. Officer Bennett attempted to apprehend the pair but they opened fire on him and fled in a Pontiac car. The officer radioed for help, engaged in pursuit and was joined by police reinforcements as the Pontiac drew up in front of a house at 1318 Farragut Street. Peterson left the Pontiac, in his haste fell while crossing to the house and there was quickly subdued. At his side was a shotgun later to be identified as one which had been stolen from the Arms Room the previous June 29th. Peterson's companion, still armed, later to be identified as one Gantt,[3] fled to the rear of the house. Pursuing officers presently found that a forcible entry there had been made. There was testimony at trial that a police officer, scanning the house by flashlight, had caught a glimpse of a man with a long-barreled rifle standing at the window of an upstairs bedroom. In hot pursuit, officers invaded the Farragut Street house. It developed that Peterson's companion, Gantt, was found changing his clothes in a pantry. Concerned that yet other armed persons might be present, the officers undertook security steps. In plain view near an open closet on the second floor Officer Bennett sighted a shotgun. Additionally there were shoulder holsters, one containing a weapon, bayonets, ammunition, a number of live and some spent rounds of .12-gauge ammunition and other military-type items which, it later developed, had been part of the Government property stolen from the Walter Reed Arms Room on the night of the June 29, 1971, burglary. In the closet itself, a partially opened trap door yielded a view of the butts of two rifles protruding from a sack in which also were three M-14s, two being fully loaded. Not unexpected-

ly under the circumstances, the shoot-out on 16th Street, the flight of Peterson and Gantt, the hot pursuit leading to the Farragut Street house and the seizure there of evidence as above described, intensified developments of the case.

### III

The shoot-out previously described,[4] the flight of Peterson and Gantt, the hot pursuit by the officers, the possession by Peterson of the shotgun stolen at the Walter Reed Arms Room, and the discovery of the stolen property at the Farragut Street house gave rise to the first real break leading to the solution of the burglary and theft. Thereupon, further investigation produced the trial evidence of the inculpation of the various hitherto unidentified culprits who had participated, in greater or less degree, in the common enterprise.

For example, it developed that one Robert Marshall[5] and this appellant Peterson were lessees of the Farragut Street house. By May, 1971 one Arrindell and one Parker[6] had joined Marshall and Peterson as residents at that location. Together they constituted what they themselves called the Kokayi Family. They shared living expenses. Marshall occupied a front upstairs bedroom in which was located the closet already referred to, in and near which were found some of the weapons and other stolen property. Peterson occupied a first-floor bedroom where, from time to time stolen rifles had been stored.

Parker testified that in the early morning hours of June 29, 1971, he had been awakened by Marshall and then was asked to come downstairs. There, after meeting Carter and Patterson,

3. Peterson and Gantt on October 24, 1972, were tried and found guilty on two counts of assault with intent to kill while armed and two counts of assault on a member of the police force while armed. Peterson's conviction was affirmed without opinion, 162 U.S.App.D.C. 20, 495 F.2d 1076 (1974). Gantt had noted an appeal but thereafter absconded, and this court dismissed his appeal on September 20, 1973.

4. Evidence concerning the armed assault upon the police officer was not received at trial by agreement between the trial judge and respective counsel.

5. Marshall became a fugitive, and so far as our record shows, has not since been apprehended.

6. In due course, both Parker and Arrindell, under a grant of immunity, became witnesses for the Government.

these four went to an alley near the Farragut Street house and there joined in unloading bags from a blue Falcon, frequently driven by Carter. The bags, containing rifles as it turned out, were placed in another car in the nearby garage.

Later in the morning of June 29th, Marshall, Peterson, Parker and Arrindell scanned a newspaper for a possible news account relating to the theft of the weapons earlier placed in the garage. The next day, Arrindell and Peterson examined the weapons which, Arrindell testified, Peterson described as very accurate and powerful, judging from his experience with such weapons while stationed in Vietnam. Peterson informed Arrindell that he would like to be the owner of one of the rifles, a wish soon to become a reality when Peterson early in July told Arrindell that an agreement had been reached that each of the four roommates was to receive one of the weapons.

Thereafter, from time to time, Carter returned to the Farragut Street house, conferred with Peterson after which Peterson joined Carter in transferring weapons from the garage to Marshall's second-floor bedroom.

Both Parker and Arrindell in yet other respects testified to Peterson's repeated collaboration with Carter and Patterson in the transfer, control and removal of M-14 rifles and other Government property.

Groups of friends of the Kokayi Family were present on occasions when Peterson demonstrated his familiarity with the weapons and, indeed, had shown one of the women visitors the manner in which a M-14 rifle was to be taken apart and reassembled.

We need not now reiterate further details[7] of the ongoing collaboration of the named appellants, of Arrindell and Parker, of the participation by Marshall, Gantt and others, all of whom in furtherance of their common enterprise[8] had participated jointly as co-venturers, aiding and abetting[9] one another in the execution of their common scheme.

We may properly re-emphasize that when Peterson fled the scene of the shoot-out with Officer Bennett, he made directly for the Farragut Street house near which he fell while carrying a shotgun which had been stolen from the Arms Room June 29, 1971. That he well knew he had been acting with others in the removal and concealment of stolen Government property was established at trial beyond peradventure.

### IV

Peterson here has contended, in effect, that the court erred in permitting the jury to infer from his unexplained possession of stolen property that he knew that the Government weapons, with the concealment and transfer of which he was so intimately concerned, had been stolen and that knowingly he had so received it.

■ Peterson did not testify at the trial,[10] and no explanation was offered as to possession of the stolen property. Peterson's counsel objected to an instruction which included the word "recently" as the trial judge instructed with reference to the inference permissibly to be drawn from the unexplained possession of the stolen property.[11] The judge em-

---

7. For a comprehensive aggregation of pertinent facts, *see* the opinion by Judge Justice referred to in footnote 2, *supra.*

8. It may not be unreasonable to assume that the Kokayi Family and their adherents were purposeful militants in furtherance of a "King Kong is Black" objective.

9. *See* Pereira v. United States, 347 U.S. 1, 9, 10, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

10. Carter and Patterson, for their part, not only denied participation in the bizarre episode but advanced an alibi defense.

11. The trial judge made it clear that the term "recently" was "relative," depending upon all circumstances shown by the evidence. He was clearly correct. Altom v. United States, 454 F.2d 289, 294–295 (CA 7), cert. denied, 406 U.S. 917, 92 S.Ct. 1765, 32 L.Ed.2d 116 (1972). *See also* the text of Pendergrast v. United

phasized that the defendants themselves were not required to furnish an explanation, indeed he pointed out that "you cannot draw the inference under consideration if on the evidence as a whole you have a reasonable doubt as to their guilt."

We are satisfied that Peterson's contention in this respect must be rejected. Barnes v. United States, 412 U.S. 837, 843, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973).[12]

## V

Peterson has argued, quite apart from his possession of the stolen shotgun at his side when he sought to escape the pursuing Officer Bennett, that in any event the District Judge had erred in his denial of the defense motions to suppress the evidence seized at the Farragut Street house. It will be recalled that before the judge was the evidence of the shoot-out, the arrest of the armed Peterson, the flight of the armed Gantt, his entry at the rear of the Farragut Street house, and the possible presence of yet other armed men in other portions of the premises. The search by the officers for other possible confederates and their finding of evidence of crime in no manner violated Peterson's rights. The clearly emergent circumstances following the shoot-out all combined to justify the exercise of reasonable and proper precautions by the police for their own protection. The officers at that time could not have known of the existence or the whereabouts of other members of the Kokayi Family or their possible allies following the desperate assault by Peter-

son and Gantt upon Officer Bennett. So, in their hot pursuit, their coming upon evidence in plain view did not invalidate the receipt of such evidence at the trial. Warden v. Hayden, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Dorman v. United States, 140 U.S.App.D.C. 313, 319, 320–321, 435 F.2d 385, 391, 392–393 (en banc 1970); Chappell v. United States, 119 U.S.App. D.C. 356, 359, 342 F.2d 935, 938 (1965).[13]

## VI

Peterson next argues that his admissions to the witness Arrindell were erroneously received in evidence against him in violation of his Fifth Amendment rights. There is no merit whatever in that claim. In the first place, Peterson at trial voiced no objection to Arrindell's recitation. Moreover, there is not the slightest suggestion that Peterson's incriminating statements voiced to Arrindell "were the product of any sort of coercion, legal or factual." Hoffa v. United States, 385 U.S. 293, 304, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). Overwhelmingly, it was established that Peterson with Carter and Patterson and yet others not now before us had been engaged in a common enterprise, indeed at one time or other some of the stolen rifles had been stored in his own bedroom. He may have been unhappy in his misplaced belief in Arrindell, see Hoffa v. United States, *supra* at 302, 87 S.Ct. 408, but there surely was no compulsory self-incrimination either in Peterson's having associated himself with the venture or in his confiding in Arrindell at any stage of their common enter-

States, 135 U.S.App.D.C. 20, 416 F.2d 776, cert. denied, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969) with its appended model instruction.

12. *See also* United States v. Fench, 152 U.S. App.D.C. 325, 332–334, (and note 15) 470 F.2d 1234, 1241–1243 (1972), cert. denied sub nom. Blackwell v. United States, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973); *cf.* United States v. Barlow, 152 U.S.App.D.C. 336, 470 F.2d 1245 (1972).

13. *See also* McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948); United States v. Miller, 145 U.S.App. D.C. 312, 315, 449 F.2d 974, 977 (1970); *and see generally*, United States v. Wright, 146 U.S.App.D.C. 126, 129–130, 133, 449 F.2d 1355, 1358–1359, 1362 (1971), cert. denied, 405 U.S. 947, 92 S.Ct. 986, 30 L.Ed.2d 817 (1972); United States v. Thweatt, 140 U.S.App.D.C. 120, 124–126, 433 F.2d 1226, 1230–1232 (1970).

prise, *id.,* 385 U.S. 303–304, 87 S.Ct. 408.[14]

We find no error with respect to the receipt in evidence of Peterson's admissions to his collaborator, Arrindell.

### VII

█ Finally we reach Peterson's claim that there was error in the denial of his motion for severance. The extent of Peterson's collaboration throughout has already been noticed. We have repeatedly held that a ruling by the trial court denying severance is not to be disturbed on appeal unless a clear abuse of discretion can be shown. United States v. Hopkins, 150 U.S.App.D.C. 307, 310, 464 F.2d 816, 819 (1972); United States v. Wilson, 140 U.S.App.D.C. 220, 226, 434 F.2d 494, 500–502 (1970); Brown v. United States, 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 315 (1966), cert. denied, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967). No such showing has been made here.[15]

### CONCLUSION

Having carefully considered the claims advanced by Peterson and having found no error, an order may be entered affirming the judgment in the District Court.

Affirmed.

---

**14.** *See, generally,* United States v. Ushakow, 474 F.2d 1244 (CA 9 1973); United States v. Sanders, 463 F.2d 1086, 1088 (CA 8 1972); United States v. Spencer, 415 F.2d 1301, 1304 (CA 7 1969); United States v. Rinaldi, 393 F.2d 97, 99 (CA 2), cert. denied, 393 U.S. 913, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968). 28 U.S. C.A., Federal Rules of Evidence, Rule 801(d)(2)(E); *and see Id.,* Rule 801(d)(2)(A); *cf.* United States v. Matlock, 415 U.S. 164, 172, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

**15.** An important recent case where this court has considered various aspects of this problem is United States v. Caldwell, Part V (sl. op. 43) and notes 116, 117, 118 and 121 (1974), where

Judge Robinson has taken account of United States v. Hurt, 155 U.S.App.D.C. 217, 222, 476 F.2d 1164, 1169 (1973); United States v. Gambrill, 146 U.S.App.D.C. 72, 83–84, 449 F.2d 1148, 1159–1160 (1971), and yet other situations where claims for severance have been discussed. We have long since pointed out that the mere fact that an appellant might have had a better chance of acquittal if tried separately does not establish his right to a severance. *See, e. g.,* Dykes v. United States, 114 U.S.App.D.C. 189, 190, 313 F.2d 580, 581 (1962), cert. denied, 374 U.S. 837, 83 S.Ct. 1889, 10 L.Ed.2d 1059 (1963).