**UNITED STATES of America**

v.

**Robert C. MARDIAN, Appellant**

No. 75–1383.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1976.

Decided Oct. 12, 1976.

---

David Ginsburg, Washington, D. C., with whom David G. Bress, Ronald P. Wertheim, and Thomas C. Green, Washington, D. C., were on the brief, for appellant.

Peter M. Kreindler, Washington, D. C., Counsel to the Sp. Prosecutor, with whom Henry S. Ruth, Jr., Sp. Prosecutor, Washington, D. C., at the time the brief was filed, Peter F. Rient, Kenneth S. Geller, Maureen E. Gevlin, Jay B. Stephens and Judith A. Denny, Asst. Sp. Prosecutors, Washington, D. C., and Sidney M. Glazer, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, ROBINSON and MacKINNON, Circuit Judges, sitting *en banc.*

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge.

Robert C. Mardian appeals from his conviction of conspiracy under 18 U.S.C. § 371 (1970). He was tried in the District Court along with H. R. Haldeman, John D. Ehrlichman, and John N. Mitchell, whose appeals we are also deciding today. *United States v. Haldeman,* Nos. 75–1381, 75–1382, 75–1384 & 76–1441. The jury found a conspiracy to obstruct justice and defraud the United States by impeding a grand jury investigation into a break-in at the Watergate Office Building and into other related matters. The basic facts of the case are recited at length in our *Haldeman* opinion and need not be repeated here. A brief summary of the Government's evidence as to Mardian's involvement will suffice.

1. Mardian met with Mitchell, Jeb Magruder, and Frederick LaRue in California on June 17, 1972, the day of the Watergate break-in, to discuss how the Committee to Re-elect the President (CRP) should respond to the incident. Mardian then placed a number of calls in an effort to contact Attorney General Kleindienst and have the burglars released before their identities became known. Tr. 4530–4536, 6562–6565.

2. On June 18 Mardian helped Magruder and LaRue prepare a press release to be issued by Mitchell, disclaiming any CRP tie to the break-in, although by then Mardian knew that Mitchell and Magruder, Director and Deputy Director of CRP, and G. Gordon Liddy, CRP General Counsel, were involved. Tr. 4537–4540, 6565–6569, JA 912.

3. On June 19 Mardian was present at a meeting where Mitchell suggested that Magruder destroy Gemstone documents. Tr. 4540–4550, 6570–6573.

4. On June 20 or 21 Mardian and LaRue met with Liddy. After receiving assurances of confidentiality, Liddy described the Gemstone intelligence-gathering program, Mitchell's and Magruder's involvement, and

his own role in carrying out the plan. Mardian, in accordance with his promise, did not reveal this information except to Mitchell. Moreover, even after gaining this knowledge, Mardian actively misled Kenneth Parkinson into believing that Liddy was acting on a lark of his own. Parkinson, a co-defendant whom the jury found not guilty, was the lawyer hired by Mardian to serve as trial counsel for CRP in civil suits growing out of the Watergate break-in. Tr. 2816–2817, 4570–4573, 6598–6604, 6655–6659.

5. Mardian told John Dean that Dean could monitor the Government investigation of the break-in most effectively by getting copies of FBI lead sheets, and, although he was no longer a Government official, Mardian himself examined FBI documents during the course of the conspiracy. He also urged Dean to slow down the FBI investigation. Tr. 2830–2831, 2836–2837.

6. Mardian attended meetings where the participants developed a false cover story to explain the $199,000 Magruder had authorized for disbursement to Liddy. Mardian participated at least to the extent of suggesting that the original tale simply would not hold up before the grand jury. Tr. 2759–2763, 4552–4562, 6652–6660.

7. Mardian had some small role in the development of hush money plans. He learned from Liddy on June 20 or 21 of CRP "commitments" to the burglars for legal fees and other expenses, and was present when LaRue assured Liddy that the commitments would be kept. Tr. 4010–4011, 6601–6603. At a meeting on June 24 where possible sources for the money were discussed, Mardian encouraged the others to look to the Central Intelligence Agency (CIA) to provide the funds. Tr. 2728–2730, 6610.

Mardian denied that most of these incidents took place, and for others he offered plausible explanations consistent with his innocence.[1] The evidence was sufficient to go to the jury, but it must be acknowledged that the proof as to most of these incidents was not as strong as the evidence relating to the other three defendants who were convicted. For example, only Jeb Magruder placed Mardian with any confidence at the June 19 meeting at the precise time when Mitchell directed Magruder to destroy Gemstone documents. Tr. 4548–4550. LaRue was there but could not confirm Mardian's presence at the crucial time. Tr. 6572–6573. Dean too was uncertain about when Mardian left, but in any event Dean heard no suggestion that documents be burned. Tr. 2673–2674. Under cross-examination even Magruder expressed some uncertainty as to when Mardian departed. Tr. 5215. Mardian insisted he left early to begin making phone calls to find a trial lawyer for the Watergate civil suits. Tr. 10746–10747.

Mardian did, however, admit the occurrence of one major incident—the June 20 or 21 meeting with Liddy. He did hear Liddy's story in its entirety, and Mardian even agreed that he had subsequently been "less than honest" in his relationship with Parkinson concerning Liddy's role. Tr. 11014. He defended these actions, however, on the ground that he was convinced his conduct was compelled by the ethical canons governing the actions of a lawyer serving, as he was, as "in house" counsel to a corporate client, Parkinson being "outside" counsel hired for a limited purpose. We shall have more to say about this defense in due course.

Mardian principally contends that the District Court erred in failing to sever his trial from that of the other defendants. Under the particular circumstances presented we agree and remand for a new trial.

---

1. For example, Mardian testified that he had never urged the conspirators to look to the CIA to help meet the burglars' money demands. Tr. 10799. He suggested, however, that he might conceivably have observed in passing that if these were CIA people the CIA should take care of them. And he recited substantial information then available to him that did tend to indicate CIA involvement. Tr. 10799–10807, 10890. It was in any event undisputed that the burglars all had prior CIA connections, and that they were all carrying false identifications supplied by the CIA at the time of their arrests.

## I. SEVERANCE

■ A motion for severance, *see* Rule 14, Fed.R.Crim.P.,[2] is addressed to the sound discretion of the trial court, and a ruling denying severance will not be reversed unless there is shown an abuse of that discretion. *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Peterson,* 173 U.S.App.D.C. 49, 54, 522 F.2d 661, 666 (1975); *United States v. Leonard,* 161 U.S.App.D.C. 36, 46, 494 F.2d 955, 965 (1974); *United States v. Gambrill,* 146 U.S.App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971); *United States v. Wilson,* 140 U.S.App.D.C. 220, 226–228, 434 F.2d 494, 500–502 (1970). In applying this well established rule, however, courts have always kept in mind the problems inherent in trial of conspiracy cases involving numerous defendants. The Supreme Court has long recognized that in such cases "the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant * * *." *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 468, 86 L.Ed. 680 (1942). The "dangers of transference of guilt" are such that a court should use "every safeguard to individualize each defendant in his relation to the mass." *Kotteakos v. United States,* 328 U.S. 750, 774, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). *See Blumenthal v. United States,* 332 U.S. 539, 559–560, 68 S.Ct. 248, 92 L.Ed. 154 (1948).

Particularly where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that that guilt will improperly "rub off" on the others. *United States v. Kelly,* 349 F.2d 720, 756–759 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). In *Kelly* the Court of Appeals for the Second Circuit emphasized that severance is among the most important safeguards available to minimize the risk of prejudice, and it ordered a new separate trial for the one alleged co-conspirator who was disadvantaged by the disproportion in the evidence. *Id.* at 756. *See United States v. Donaway,* 447 F.2d 940, 943 (9th Cir. 1971). This court has often expressed its acceptance of the rule announced in *Kelly,* requiring severance when the evidence against one or more defendants is "far more damaging" than the evidence against the moving party. *United States v. Bolden,* 169 U.S.App.D.C. 60, 69, 514 F.2d 1301, 1310 (1975); *United States v. Leonard, supra,* 160 U.S.App.D.C. at 47, 494 F.2d at 966; *United States v. Gambrill, supra,* 142 U.S.App.D.C. at 83, 86, 449 F.2d at 1159, 1162; *McHale v. United States,* 130 U.S.App.D.C. 163, 164, 398 F.2d 757, 758, *cert. denied,* 393 U.S. 985, 89 S.Ct. 462, 21 L.Ed.2d 447 (1968).[3]

Mardian made out a fairly strong case under the *Kelly* doctrine when he moved for severance before trial. JA 318–325. He pointed out that, unlike the other six original indictees,[4] he had been named only in the conspiracy count. All the others were named at least in Count 2, charging the substantive offense of obstruction of justice; four were accused as well of one or more individual counts of perjury. Count 1, charging them all with conspiracy, alleged 45 overt acts. Of these only five involved

---

2. Rule 14 provides in relevant part:

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. * * *

3. The Government argues, citing *United States v. Wilson,* 140 U.S.App.D.C. 220, 228 & n. 15, 434 F.2d 494, 502 & n. 15 (1970), that *Kelly* applies only where "incriminating evidence that was inadmissible against the appellant

was admitted against a co-defendant." *Id.* Even if *Kelly* is thus limited, here Mardian claims he was subjected to such evidence. *See* note 6 *infra* and accompanying text.

4. As explained in our *Haldeman* opinion, only five of the original seven named in the indictment went to trial together. The charges against Charles Colson were dropped upon his guilty plea in another case, and the case against Gordon Strachan was severed and ultimately dismissed. The jury then found Parkinson not guilty of the crimes charged against him.

Mardian. And, most significantly, none charged Mardian with any activity after July 21, 1972, roughly one month after the break-in, although it was alleged that the conspiracy continued up to the date of the indictment, March 1, 1974.

 In fact, it developed at trial that Mardian had sought to be transferred back to regular campaign duties beginning shortly after he was assigned (on June 19) to serve as counsel for CRP with respect to the civil suits growing out of Watergate. On July 4 or 5, 1972, having been rebuffed in his earlier attempts at reassignment, he delivered an ultimatum to Mitchell insisting he would leave CRP totally unless granted a transfer. Mitchell acquiesced, and Mardian ceased his role as CRP counsel for Watergate matters in mid-July. The Government does not contend that he had any substantial involvement in the conspiracy after July 1972, although it does insist—and we agree—that Mardian's terminating active participation did not amount to withdrawal.[5] It is accepted, then, that if Mardian was a conspirator he, unlike the other convicted conspirators, was active only for a few weeks.

As the trial developed it became even clearer that a substantial part of the testimony would focus on events after Mardian ceased active participation. Much of the most damaging testimony related to the spring and summer of 1973, a time when the cover-up was coming unraveled. During March and April of that year many of the conspirators, especially Dean, Magruder, and LaRue, began telling all they knew to the prosecutors. Haldeman and Ehrlichman, and to a lesser extent Mitchell, were plotting "scenarios" in the White House to cope with the impending collapse of the cover-up. On April 30 Haldeman and Ehrlichman resigned from their White House posts. Then in June the Senate Select Committee began its hearings and thereby furnished the setting for many of the perjurious statements charged against Mardian's co-defendants. Mardian had long since left Washington and ceased active participation.

Moreover, tape recordings of conversations between conspirators played an undeniably important role in the prosecution's case. Twenty-four of the 30 tapes the prosecution played presented conversations that occurred during March and April of 1973, further underscoring the significance of that time period. Mardian was not a participant in any of the 30 taped conversations. His name was mentioned five times on the tapes played to the jury. He challenged in timely fashion each of the references as inadmissible and moved to have them deleted, supporting his motion with a lengthy memorandum of points and authorities. JA 638. The court did delete a few references, but the five challenged here remained.[6]

Not all of this information developed during the trial was available to the District Court at the time it considered Mardian's

---

5. Had Mardian withdrawn, the declarations of co-conspirators uttered after the date of his withdrawal would not be admissible against him. *See Lutwak v. United States,* 344 U.S. 604, 617–618, 73 S.Ct. 481, 97 L.Ed. 593 (1953). But withdrawal requires "either the making of a clean breast to the authorities, * * * or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). *See Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). Mardian's actions do not satisfy this test. *Cf. United States v. Nowak,* 448 F.2d 134, 139 (7th Cir. 1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972) (resigning as lawyer did not constitute withdrawal from conspiracy).

6. In light of our disposition of the case, we need not determine the admissibility of these references since the question, if it arises on retrial, will appear in a vastly different setting. Even if some references are technically admissible under various exceptions to the hearsay rule, the court is still called upon to exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury * * *." Rule 403, Fed.R.Evid. When Mardian is retried singly, the major focus will be on the period of June and July of 1972. Without the need to introduce evidence against other defendants, the balance between relevance and prejudice of statements made in March and April of 1973 may be substantially altered.

pretrial motion for severance.[7] In denying the motion the court cited the "general rule" that defendants jointly indicted should be tried together. *United States v. McDaniel,* 176 U.S.App.D.C. 60, 62, 538 F.2d 408, 410 (1976); *Brown v. United States,* 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 315, *cert. denied,* 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967). And there are indeed strong interests favoring joint trials, particularly the desire to conserve the time of courts, prosecutors, witnesses, and jurors. *See United States v. Hines,* 147 U.S.App. D.C. 249, 266, 455 F.2d 1317, 1334, *cert. denied,* 406 U.S. 969 & 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972).

■ Mardian had made a substantial pretrial showing of possible prejudice requiring severance under the *Kelly* doctrine. But based on the information then before the court, that showing was not so compelling that it was clear Mardian's interest in a separate trial outweighed these interests favoring joinder. We are therefore unable to say that this initial denial of severance constituted an abuse of discretion. Nonetheless, Mardian's *Kelly* showing remained a substantial factor to be kept in mind as the trial progressed. And the court, in denying the motion, did take specific note of its "continuing duty at all stages of the trial to grant a severance if prejudice does appear." *Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). *See United States v. Wilson, supra,* 140 U.S.App.D.C. at 225–226, 434 F.2d at 499–500; *Sims v. United States,* 132

U.S.App.D.C. 111, 112 n.1, 405 F.2d 1381, 1382 n.1 (1968).

■ Such an occasion arose two weeks into the trial of the case, when Mardian's lead counsel, Mr. David Bress, became ill and was forced to enter a hospital for surgery. At a hearing on November 1, 1974, Mardian's co-counsel, Mr. Thomas Green, told the court that Bress would be unavailable for at least six weeks. On Mardian's behalf he moved for severance a second time. He emphasized that a defendant has a cherished right to employ counsel of his choice,[8] and pointed out that he personally had not been retained by Mardian. As an associate in Bress' firm, he had come in on the decision of Mr. Bress and had really only become acquainted with Mardian at the commencement of the trial. JA 614–616. Mardian addressed the court and stressed the importance of the case to him and the care he had taken in selecting Bress. JA 616–618. The Government did not oppose the motion. It took this position for personal reasons stemming from a long-standing friendship between Mr. Neal, head of the prosecution team, and Mr. Bress, but indicated that it did not regard severance as legally required. JA 618–620.

■ The court denied the motion for severance. It expressed confidence in the ability of Mr. Green to take over for Mr. Bress; he had had ample trial experience, including three years as an Assistant United States Attorney. The court was also concerned about having to grant similar continuances to other defendants should their lead counsel become ill. JA 620–626.[9]

---

7. Mardian did raise many of the same points in a motion for a new trial filed Jan. 16, 1975. JA 839–845. The court denied the motion. JA 868–869, *United States v. Mitchell,* 389 F.Supp. 917, 921–922 (D.D.C.1975).

8. *See, e. g., Crooker v. California,* 357 U.S. 433, 439, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958); *Chandler v. Fretag,* 348 U.S. 3, 9–10, 75 S.Ct. 1, 99 L.Ed. 4 (1954); *Releford v. United States,* 288 F.2d 298, 301 (9th Cir. 1961); *Lee v. United States,* 98 U.S.App.D.C. 272, 274, 235 F.2d 219, 221 (1956).

9. Later, in denying Mardian's post-trial motion for a new trial, the court amplified on the grounds for its ruling. It referred to the well

established rule that a defendant's right to an attorney of his choice is "not so absolute as to permit disruption of the fair and orderly administration of justice when another competent attorney is available to continue the defense. See generally *Lofton v. Procunier,* 487 F.2d 434, 435 (9th Cir. 1973); *United States v. Harrelson,* 477 F.2d 383, 384 (5th Cir.), *cert. denied,* 414 U.S. 847, 94 S.Ct. 133, 38 L.Ed.2d 95 (1973); *McGill v. United States,* 121 U.S.App. D.C. 179, 348 F.2d 791, 794–95 (1965)." JA 869, 389 F.Supp. at 921–922. The rule is undeniably sound but, as we develop more fully in text, the District Court failed to take adequate account of the strength of Mardian's interest in

This ruling was in error. The District Court's action might well have been acceptable if the only real question before it were the competency of Mr. Green to continue Mardian's representation. Indeed, no one has contended on appeal that his services were in any way inadequate.

But more was at stake, and the court's stated ground for denial—concern about similar problems with other defendants' lead counsel—was inadequate to justify the result. In the first place, it was absolutely clear that Mardian bore no responsibility for the potential disruption; Bress' illness was *bona fide* and unforeseeable.[10] The same situation was most unlikely to occur with respect to other defendants. Even if it did, it would have arisen under totally different circumstances. Two factors made Mardian's motion unique and should have prompted the court to sever, notwithstanding the availability of Mr. Green to continue the defense.

First, Mardian's November 1 motion must be considered against the backdrop of the solid *Kelly* showing he had made before trial.[11] The evidence against Mardian was not as strong as that marshalled against his co-defendants. With the possible exception of Parkinson (who was ultimately acquitted), no other defendant could claim the same disproportion in the evidence. Where the evidence is of this

character it is especially important that the defendant be granted every safeguard.[12] The accused under such circumstances has a special interest in representation by experienced counsel of his own choice in whom he can have the kind of confidence that grows from long-standing acquaintance—at least if his choice can be honored without undue disruption.

The second factor thus assumes the highest importance, for it demonstrates that severance would not have caused undue disruption: The Government did not oppose Mardian's motion. Although the prosecution took this position on personal grounds, its stance meant, at the very least, that the prosecution saw no significant problems if it had to try Mardian's case separately. Put another way, it saw no compelling interest in continued joinder.

Naturally, in passing on a motion for severance the court must consider not only the burdens on the prosecution, but also the burdens any new trial would place on the court, the witnesses, and a new jury panel. But here the prosecution's position was entirely consistent with the posture of the case at that point. Only two weeks of a three-month trial had elapsed. The limited period of Mardian's active involvement, if any, in the conspiracy also suggested a minimal burden to retry him; it would likely require only a short trial and a fairly small

light of the *Kelly* showing he had made in connection with his pretrial severance motion. Likewise, the court overestimated the degree of disruption, given the prosecutor's determination not to oppose the Nov. 1 motion.

10. *Cf. Giacalone v. Lucas*, 445 F.2d 1238 (6th Cir. 1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 960, 30 L.Ed.2d 793 (1972). There the question was whether the District Court should have granted a continuance until the defendant's chief counsel was released from the hospital. The court listed the factors to be considered, including significantly "whether the delay seems to be for legitimate reasons, or whether it is purposeful and dilatory * * *." *Id.* at 1240.

11. In moving for severance at the Nov. 1 hearing, Mardian's counsel emphasized: "I would also like the Court to consider all of the other grounds which we have raised for severance heretofore in our previous pleadings * * *."

JA 615. It is in any event incumbent on the court to consider a motion for severance "in light of the other elements present in the case * * *." *United States v. Gambrill*, 146 U.S. App.D.C. 72, 87, 449 F.2d 1148, 1163 (1971).

12. In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true where the scales of justice may be delicately poised between guilt and innocence. Then error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial * * *.

*Glasser v. United States*, 315 U.S. 60, 67, 62 S.Ct. 457, 463, 86 L.Ed. 680 (1942). *Glasser* too was a case where a defendant charged with conspiracy contended he had been denied proper assistance of counsel of his choice; the Court reversed as to that defendant.

number of witnesses. In such a situation, when the prosecution indicates that in its view a separate trial would cause no undue disruption, that prosecutorial judgment is a substantial factor that affects the balance between joinder and severance. In the particular circumstances of this case, Mardian's interest in being represented by counsel of his own choice, combined with the disproportion of the evidence to his potential prejudice, necessitated severance. On this ground we reverse and remand for a new trial.

## II. INSTRUCTIONS ON MARDIAN'S THEORY OF DEFENSE

What we have said above suffices to dispose of the case. One of Mardian's other assignments of error requires discussion, however, because the question is likely to arise upon retrial.

■■■ Mardian claims that the District Court failed to instruct the jury adequately on his theory of defense based on the fact that he was acting as CRP's lawyer during June and July of 1972. The defense is relevant to two incidents portrayed in the Government's case. First, and most important, after pledging qualified confidentiality based on his role as CRP's lawyer, Mardian learned from Liddy on June 20 or 21 the details of Gemstone and the break-in. Thereafter, he—at a minimum—did not disclose this information to Parkinson, a lawyer with whom he was working to defend CRP in the Watergate civil suits for damages based on the break-in; to some extent he actively misled Parkinson. Mardian basically admitted these facts. Therefore it was crucial to his case to show that he thought he was compelled to act as he did by the ethical obligations of a lawyer. He argues that the court should have instructed the jury in some detail as to the complexities of the attorney-client privilege in an organizational setting. In his view he was serving as "inside" counsel to CRP while Parkinson was "outside" counsel hired for a limited purpose. Inside counsel, Mardian argues, "plainly does not have the same co-equal relationship with outside counsel that two law partners normally have with each other." Mardian br. at 92. An instruction along these lines would apparently support Mardian's belief that he could not be fully candid with Parkinson.

The second incident involved Mardian's alleged participation in meetings at which evolved Magruder's cover story for the $199,000 given to Liddy—a false story developed in anticipation of Magruder's appearance before the grand jury. Here Mardian's "legal obligations" defense was less important, for he denied any role in developing the cover story. He did agree, however, that he had often met with Magruder and others in an effort to find out just how much money Magruder had authorized for Liddy. He did this, he contended, in pursuance of his obligation to learn the facts. Tr. 10771–10778. Mardian asserts that the court should have instructed explicitly on a lawyer's obligation to resolve doubts about a client's state of mind in favor of his client. Such an instruction might throw light on his discussions with Magruder, and it would also relate to the reasons for Mardian's repeating some of the Magruder explanations to Parkinson, notwithstanding his doubts as to their accuracy.

We reject these contentions. The court's instruction to the jury [13] was completely

**13.** That instruction reads in full:

*Two Defendants, Messrs. Mardian and Parkinson,* claim to have participated in or directed the legal representation of the Committee to Re-elect the President in response to a civil suit filed by the Democratic National Committee. This fact may have some bearing on the specific intent of these two Defendants. In weighing and evaluating the evidence relating to the element of intent you should consider whether the actions taken by each of these Defendants were undertaken pursuant to good faith legal representation or whether they were un[der]taken with a criminal intent and in furtherance of the conspiracy charged.

Let me point out that a lawyer has a duty to become fully informed of all facts of the matter he is handling.

The relationship between a lawyer and his client is absolutely confidential, requiring a high degree of trust and good faith. An attorney is ethically required to preserve the confidences and secrets of his clients. This

adequate to present Mardian's theory. Mardian's claim is fundamentally a claim that he acted without criminal intent in connection with these two alleged episodes. The jury was not called upon in this case to determine whether the attorney-client privilege in fact did prevent Mardian from disclosing to Parkinson what Liddy had told him. It had only to determine whether Mardian believed he was thus constrained and, if so, whether Mardian's belief was of such a character that it meant he was not acting with specific intent to advance the purposes of the conspiracy. Indeed, Mardian's own counsel argued this point forcefully during a colloquy at the bench over a certain line of questioning being pursued by the prosecution concerning the attorney-client privilege: "The issue here is *what was Mr. Mardian's state of mind,* not whether someone else's statement of the attorney-client privilege comports with the facts [the prosecution] attempts to bring out." Tr. 10926 (emphasis added).

The court's instruction quite properly focused on the question of intent. It begins:

Two defendants, Messrs. Mardian and Parkinson, claim to have participated in or directed the legal representation of the Committee to Re-elect the President in response to a civil suit filed by the Democratic National Committee. This fact may have some bearing on the specific intent of these two defendants. * * *

Tr. 12370. And again, after explaining the law governing an attorney's obligations, the court repeated: "What all this boils down to is a question of intent." Tr. 12371.

■ Moreover, the court did not leave the jury at sea with respect to the governing law. In a manner entirely favorable to Mardian (and drawing upon language from Mardian's proposed instruction, JA 726–731), the court stressed that "a lawyer has a duty to become fully informed of all facts of the matter he is handling," and that "[a]n attorney is ethically required to preserve the confidences and secrets of his clients." Tr. 12370. The court's further instruction that the attorney-client privilege does not extend to communications "which are in aid of or in furtherance of a crime or fraud" accurately states the law and cannot be a ground for complaint. *See Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *Alexander v. United States,* 138 U.S. 353, 358–360, 11 S.Ct. 350, 34 L.Ed. 954 (1891); *United States v. Rosenstein,* 474 F.2d 705, 715 (2d Cir. 1973).

■ What was said was enough to present the question to the jury with proper guidance. The court was not obliged to go further and deliver Mardian's lengthy and complicated instruction verbatim. In the first place, Mardian's proposal was at some points misleading in its statement of the governing law.[14] It is not error to refrain

---

is the basis of the so-called attorney-client privilege.

It is well settled, however, that this attorney-client privilege which we are talking about does not extend to communications between an attorney and client which are in aid of or in furtherance of a crime or fraud. The privilege does not apply to shield such criminal conversations.

What all this boils down to is a question of intent. If you find, based on the evidence and what I have told you about the duties and limits on the duties of a lawyer, that either or both of these Defendants, that is, Mr. Mardian and Mr. Parkinson, either one or both, lacked the criminal intent to join and further the conspiracy charged in Count One because he was merely doing his jo[b] as a lawyer, you must find that Defendant or both Defendants if you so find, not guilty of Count One. But if you find that either Mr. Parkin-

son or Mr. Mardian, or both of them, were acting with the intent to participate in the alleged conspiracy, then the fact that he happened to be active as a lawyer also is no defense, and he should be found guilty provided all the other elements are also established beyond a reasonable doubt.

Tr. 12370–12371.

14. For example, Mardian's proposed instruction could easily mislead the jury on the constraints against disclosure that applied to Mardian's relationship with Parkinson:

Unless a client explicitly gives his consent, a lawyer is prohibited even from disclosing the confidential information of his client to other lawyers handling related matters.

JA 728 (footnote omitted). Mardian purports to draw this principle from American Bar Association, Code of Professional Responsibility, Canon 4, EC 4–2 (1971). That provision states,

from giving a misleading requested instruction. *See McGuinn v. United States,* 89 U.S.App.D.C. 197, 199, 191 F.2d 477, 479 (1951); *United States v. Leach,* 427 F.2d 1107, 1112 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970); *United States v. Kelly, supra,* 349 F.2d at 759. More importantly, the instruction actually delivered, in conjunction with the healthy opportunity given to Mardian to argue his theory to the jury and to speak of it during his testimony,[15] presented Mardian's theory in sufficient detail, yet avoided encumbering the jury with unnecessary complications.[16] *Cf. United States v. Anderson,* 165 U.S.App.D.C. 390, 409, 509 F.2d 312, 331 (1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). The District Court's treatment of this defense was entirely acceptable.

For the reasons stated in Part I of this opinion, the conviction is reversed and the case is remanded for a new trial in accordance with this opinion.

*Reversed and remanded.*

however, that "[u]nless the client otherwise directs, a lawyer may disclose the affairs of his client to partners or associates of his firm." It is true that Mardian and Parkinson were not partners in the same firm, but the analogy for purposes of the disclosures at issue here is quite strong. Mardian nonetheless persists in his claim that a different sentence of EC 4–2 governs: "[I]n the absence of consent of his client after full disclosure, a lawyer should not associate another lawyer in the handling of a matter * * *." This sentence might apply if Liddy were Mardian's client, for it was only Liddy who insisted on complete confidentiality and never waived the privilege. But CRP, not Liddy, was Mardian's client, and there was no evidence that CRP did not consent to associating Parkinson in the full Watergate matter.

15. *See, e. g.,* Tr. 2506–2507, 2521, 2543, 2548 (opening statement); 12153, 12156–12157, 12164–12165, 12175–12176 (closing argument); 10655, 10750–10752, 10762, 10779–10780, 10920, 11019 (Mardian's testimony).

16. For similar reasons the District Court did not abuse its discretion in denying Mardian's counsel permission to read ABA Canon 4, EC 4–2, *supra* note 14, during closing argument. Mardian did not try to use this canon during his presentation of the case, nor did he contend that he specifically relied on it during 1972 as the basis for his decision not to reveal Liddy's disclosures to Parkinson. Since the question for the jury was fundamentally a question of Mardian's intent, and since the jury did not have to pass on the intricacies of a lawyer's actual ethical obligations, we think the court acted within the scope of its duty to exclude matters that might "tend to confuse the jury." *United States v. Sawyer,* 143 U.S.App.D.C. 297, 299, 443 F.2d 712, 714 (1971). *See United States v. Bearden,* 423 F.2d 805, 813 (5th Cir.), *cert. denied,* 400 U.S. 836, 91 S.Ct. 73, 27 L.Ed.2d 68 (1970) (defense counsel not entitled to read lengthy statute to jury).